1
2
3
4
5
6
7
8          **UNITED STATES DISTRICT COURT FOR THE**
9            **SOUTHERN DISTRICT OF CALIFORNIA**
10
11
12   HOMEFED VILLAGE III MASTER,    )   Case No. **3:20-cv-0784-L-JLB**
     LLC;                          )
13                                 )
                                   )
14                Plaintiff,       )   **ORDER DENYING DEFENDANT**
                                   )   **RECYCLING INTERNATIONAL**
15        vs.                      )   **INC.'S MOTION FOR SUMMARY**
                                   )   **JUDGMENT [ECF NO. 94]**
16   OTAY LANDFILL, INC et al;     )
                                   )
17                Defendants.      )
                                   )
18                                 )
                                   )
19                                 )
                                   )
20   _____)

21        Before the Court is a Motion for Summary Judgment filed by Defendant

22   Recycling International Inc., dba LKQ ("LKQ").  [ECF No. 94].  Plaintiff HomeFed

23   filed a Response in Opposition, and LKQ filed a Reply. The matter is submitted on the

24   briefs without oral argument.  *See* Civ. L. R. 7.1(d)(1).  For the reasons stated below,

25   Defendant LKQ's  Motion is denied.

26   //

27   //

28   //

                                    1

1

## I.   FACTUAL BACKGROUND

2       HomeFed, a property developer, brought suit against its surrounding businesses,

3 including LKQ, for contamination it encountered during development of its Otay

4 Ranch Village III property in the City of Chula Vista.

5       LKQ is a wholly-owed subsidiary of LKQ Corporation. In or about August

6 2008, LKQ Corporation acquired Pick Your Part Auto Wrecking, a self-service auto

7 parts recycler selling parts from automobiles to customers. At the time of this

8 acquisition, Pick Your Part Auto Wrecking was operating an auto wrecking facility at

9 various parcels along Energy Way, in Chula Vista, California.

10       LKQ currently uses the LKQ facility for vehicle processing. Oil, gasoline, and

11 vehicle fluids are drained from vehicles at the LKQ facility. Vehicle crushers are

12 operated at the LKQ facility. The prior owners of the facility prepared a September

13 2007 Phase I Environmental Due Diligence Report prepared by Geomatrix

14 Consultants that was provided to LKQ. In 2015, the City of Chula Vista and the

15 Regional Water Quality Control Board ("RWQCB") inspected the LKQ facility. As of

16 2016, LKQ had retained Apex Companies to perform an annual inspection of the LKQ

17 facility. On April 25, 2017, Apex performed another inspection. Apex photographed

18 the vehicle crusher used by LKQ at the facility. Apex performed another annual

19 inspection on May 8, 2018.

20       HomeFed encountered petroleum contamination in April 2017 during

21 excavation while installing a roadside stormwater trench ("Stormwater Trench") on

22 the west side of its development near the border with the LKQ Facility. In September

23 2021, Plaintiff inspected and photographed the LKQ facility and installed a

24 groundwater monitoring well on the LKQ facility. Plaintiff subsequently installed two

25 groundwater monitoring wells directly adjacent to the property line with the LKQ

26 facility. The Stormwater Trench runs downhill, along Heritage Road towards the Otay

27 River Valley, and the storm drain pipe discharges into a retention basin on the north

28

side of Main Street. This retention basin, in turn, discharges into the Otay River via a culvert under Main Street.

Plaintiff implemented emergency measures to contain and handle the impacted groundwater, utilizing sumps and cutoff walls that were installed in the storm drain trench system to mitigate impacted groundwater migration through the gravel backfill of the trench so as to prevent the impacted groundwater from flowing into the Otay River Valley. Three sumps were installed within the containment area, and a fourth sump was installed down gradient.

The sumps allow monitoring of the groundwater within the storm drain trench backfill, as well as providing the means for Plaintiff to pump the contaminated groundwater out of the containment area and dispose of it in an environmentally safe manner. To mitigate potential down gradient migration of impacted groundwater via the storm drain trench, approximately 577,100 gallons of groundwater were extracted from the four Heritage Road sumps from May 2017 to February 2019. The pumped groundwater was transported offsite to an approved disposal facility.

II.   RELEVANT PROCEDURAL BACKGROUND

On April 24, 2020, Plaintiff HomeFed Village III filed the original complaint in this action seeking declaratory and injunctive relief, or damages, for Defendants violations of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1), and common law theories of public nuisance, private nuisance, and trespass. [ECF No. 1.] Plaintiff seeks to recover costs and damages that Plaintiff has incurred or will incur in order to respond to impacts to groundwater, soil, and soil gas on the Village 3 property, by solid and/or hazardous wastes and the constituents thereof, including petroleum hydrocarbons, volatile organic compounds (VOCs), and methane. *Id*.

On May 11, 2020, Plaintiff filed a First Amended Complaint. (FAC [ECF No. 4.]) Defendant LKQ filed a motion to dismiss on July 13, 2020, which was deemed moot by a subsequent joint motion on July 27, 2020. [ECF No. 17.] Plaintiff was

allowed to amend the complaint and filed a Second Amended Complaint ("SAC") on August 6, 2020. [ECF No. 18.]

On August 15, 2022, LKQ filed the present Motion for Summary Judgment against Plaintiff HomeFed. [ECF No. 94.] On September 12, 2022, HomeFed filed a Response in Opposition. [ECF No. 115.] On September 19, 2022, LKQ filed a Reply. [ECF No. 119.]

III.   LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

The party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.  *Id.* at 322–23. If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party meets the initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts."  *Matsushita Elect. Indus. Co., Ltd. v Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, the nonmoving party must "go beyond the pleadings"

and by "the depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

The court must draw all inferences from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

"[T]he district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001). The court is not obligated "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (*citing Richards v. Combined Ins. Co. of Am.*, 55 F.3d 247, 251 (7th Cir. 1995)).

IV.   DISCUSSION

*A. Public Nuisance Claims*

Nuisance is defined as "anything which is injurious to health . . . so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the . . . use, in the customary manner, of any navigable lake, or river. Cal.Civ.Code §3479. "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." Cal.Civ.Code § 3480. A party seeking to assert a claim for public nuisance and trespass must "establish a 'connecting element' or a 'causative link' between the defendant's conduct and the threatened harm." *Citizens for Odor Nuisance Abatement v. City of San Diego*, 8 Cal.App.5th 350, 359 (2017).

//

//

1          1. *Causation*

2        LKQ argues that summary judgment is appropriate because HomeFed failed to

3   establish a migration pathway that shows LKQ caused the contamination at the

4   HomeFed site.[1] (Mot. at 6). LKQ claims that the expert opinions of Mark Cejas and

5   Gary McCue, upon which HomeFed relies to substantiate their claims, do not meet the

6   criteria for admissible evidence and do not demonstrate the migration pathway

7   Plaintiff needs to prove its claims. (*Id*. at 8). With regard to Cejas' report,  LKQ's

8   rebuttal expert, Gregory S. Douglas opined that (1) Cejas' conclusion that there was a

9   chemical match between groundwater samples collected at sumps at the Stormwater

10  Trench and LKQ's property is unreliable because no chemical match exists between

11  the samples, (2) Cejas' groundwater transport conclusions are not supported, and (3)

12  there is no forensic connection between the contaminated water at the Village 3 site

13  and LKQ facility found in the sump samples.  (Gee Dec. Ex. E at 28 [ECF No. 94-2.])

14  LKQ claims that Cejas' methodology and findings are flawed based on the finding

15  that there were asphalt pavement diagnostic signatures in the samples when LKQ had

16  no asphalt on its property.

17       LKQ further argues that McCue's December 3, 2021, expert report must be

18  excluded under *Daubert* because he fails to provide any methodology for his

19  

---

20  [1] Pursuant to LKQ's request under Federal Rule of Evidence 201(b)(2) the Court takes judicial notice of the following: "Landfill Nuisance Easement and Covenants Running

21  with the Land," recorded on March 17, 1997 (Req. Jud. Notice, Ex. A [ECF No. 93]; "Grant Deed (Otay Landfill)" recorded on October 31, 1997 (*Id*. at Ex. B); "City of

22  Chula Vista tract May No. 16-02, Otay Ranch Village III North" recorded December 13, 2016 (*Id*. at Ex. C); City of Chula Vista "Parcel Map 21636" recorded December

23  11, 2018 (*Id*. at Ex. D); Grant Deed from HomeFed Village III Master LLC to Village

24  of Escaya Apartments, LLC, recorded March 8, 208 (*Id*. at Ex E); Grant Deed from HomeFed Village III Master LLC to Escaya Self-Storage LLC recorded February 13,

25  2020 (*Id*. at Ex. F); Grant Deed from HomeFed Village III Master LLC to RG Escaya,

26  LLC, recorded March 9, 2022 (*Id*. at Ex. G).

27       Request for judicial notice of Litigation Guaranty from Fidelity Title, Exhibit H, is **DENIED** as the document "cannot be accurately and readily determined from

28  sources whose accuracy cannot reasonably be questioned." Fed.R.Ev. 201(b)(2)

conclusion that his company traced the contamination in the Stormwater Trench to LKQ. (Mot. at 12). Instead, LKQ contends that other hydrogeologist expert witnesses have analyzed the relevant hydrogeology of the area and opined that groundwater in the region flows from northeast to southwest, from the Stormwater Trench to the LKQ facility, making it virtually impossible for LKQ to be the source of contamination in the Stormwater Trench. (*Id*. at 13).

HomeFed counters that there is sufficient admissible evidence which contradicts LKQ's assertions. (Oppo. at 15). First, HomeFed argues that LKQ is relying on data as to an entirely different aquifer than the perched groundwater running beneath LKQ and Village 3 and provides no evidence as to the relevant aquifer. (Oppo. at 15). Second, Plaintiff asserts that the perched groundwater does not flow downhill, but instead both the groundwater at LKQ and the Stormwater Trench water is found at 205 feet above mean sea level, is flat, and sits atop a flat geological strata. (*Id*.) McCue contends that free product does not move through the groundwater like a river, but that it can migrate downward and will stop at the capillary fringe where it will move laterally. (*Id*. at 15-16). HomeFed claims that Cejas' expert report is based on reliable methodology and "data showing the ratios of the terpane, sterane, and triaromatic sterane biomarkers for waters samples from the LKQ facility (SDR-02) and Village 3 (Sumps 1-4)" matched, which confirms that LKQ is the source of the contamination. (Oppo. at 17-18). In HomeFed's view, LKQ's argument that Cejas' report rests on unsupported assumptions due to his findings regarding asphalt biomarkers oversimplifies the actual data and conclusions.   (*Id*. at 17).

In *Daubert* the Supreme Court held that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to "ensure that any and all scientific testimony ... is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (citing D*aubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 597 (1993)). FRE 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness

qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed.R.Ev. 702. When determining whether an expert's methodology is reliable, a court should consider factors such as "testing, peer review, error rates, and 'acceptability' in the relevant scientific community." *Kumho Tire Co.*, 526 U.S. at 141 (citing *Daubert*, 509 U.S at 593–94). "The test is whether or not the reasoning is scientific and will assist the jury. If it satisfies these two requirements, then it is a matter for the finder of fact to decide what weight to accord the expert's testimony." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230 (9th Cir.1998). "As one court has summarized: 'Disputes as to the strength of [an expert's] credentials, faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony.'" *Id*. (citing *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir.1995).)

(a) *Cejas*

The Court finds that Cejas testimony is admissible under FRE 702 and *Daubert*. Cejas provided reliable chemical analysis of the contaminated water at LKQ and HomeFed to demonstrate the similarities between the two and support the conclusion that LKQ was the source of the contamination for purposes of summary judgment. Cejas has a Masters of Science in Analytical Chemistry from Florida International University and has been working as an analytical chemist since 2001, consulting industry and government-related clients in over 150 subsurface contamination sites across the United States. (Cejas at ¶¶ 15, 16). Cejas has published and presented on analytical chemistry and environmental forensics methods an techniques for petroleum hydrocarbons, pesticides, and legacy industrial contaminants. (*Id*. at ¶16).

LKQ does not challenge Cejas knowledge or experience with regard to chemical analysis, but challenge Cejas' education and background to the extent he renders an opinion about the hydrogeological pathway for contamination. Because Cejas' does not render an opinion on the hydrogeological pathway, but instead renders

1  an opinion on the forensic chemical composition of the samples, the Court finds his

2  education and professional experience sufficient to satisfy *Daubert*.

3       Cejas' chemical analysis in his report and testimony fall within the parameters

4  set forth under Rule 702. In his report, Cejas opined:

> The VOC and SVOC range petroleum hydrocarbons, gasoline oxygenate
> hydrocarbons, and light distillate range solvent hydrocarbons determined in
> samples from Sump-1, Sump-2, Sump-3, Sump-4, and MW-HR04 locations
> were more likely than not related to the hydrocarbon chemistry types evident in
> samples from SDR-02-FP, SDR-02, and SDR-02-CWFP. The 3 SDR samples
> were located in the LKQ property (figure 2). The four Sump and MWHR04
> samples resided within the ORV3 property boundary (figures 1, 2). MW-H04
> was located between ORV3 and LKQ at the same elevation as LKQ, and the
> height of the four sump samples was lower (figure 1). The specific relationships
> of "Chemical Fingerprints" (FPs) were conclusive 'match' cases, indicating a
> likely chemical transport pathway between the LKQ and ORV3 Sumps.

(Gee Dec. Ex. C at 14 [ECF No. 94-2.]) In support of his conclusion, Cejas listed two

chemical lines of evidence, and two site-related lines of evidence to support his

conclusion that the chemical signatures matched stating that:

> A diagnostic ether oxygenate assemblage that consisted of methyl-tert-butyl-
> ether (MTBE), and tert-amyl-methyl-ether (TAME) was apparent in product
> and water samples collected from LKQ, MW-HR04, and the Sump-3 water
> sample. The dissolved phase gasoline additives signature was diagnostic for a
> mixed gasoline source zone. The corresponding oxygenate ether assemblage
> was also apparent in water and soil samples analyzed by conventional VOC
> range analytical methods and collected from LKQ and the ORV3 Sumps.

(Gee Dec. Ex. C at 14 [ECF No. 94-2.])

     In his first chemical line of evidence and site related line of evidence, Cejas

noted the existence of "asphalt pavement diagnostic signatures" that likely was from

"solvent/fuel pavement dissolution process." Cejas stated:

> Site-Related Line of Evidence - 1 (SLOE-1): A series of asphalt pavement
> diagnostic signatures were expressed as features: water samples dominated by
> gasoline range (GRO) chemistry, product samples dominated by GRO
> chemistry, and water samples dominated by the asphalt pavement residual range
> chemistry. LKQ Auto Wrecker Facility utilizes solvents for cleaning parts and

removes refined petroleum products from discarded vehicles. The presence of asphalt pavement associated residual range petroleum biomarker, SPAH, and PAH FPs in GRO dominant water samples and GRO dominant product samples invites the interpretation that the asphalt sourced chemistry was likely from a solvent/fuel induced pavement dissolution process vs. water facilitated pavement runoff.

(Cejas Dec. at ¶54 [ECF No. 115-4.])

Cejas opines that the chemical signatures discovered in the LKQ and Village 3 water samples were caused by "numerous spills of gasoline, oil, and vehicle fluids that occurred at different points at the LKQ facility" which resulted in chemical source mixing and environmentally induced alteration effects, as discussed in peer reviewed papers authored by Dr. Douglas regarding the effects of weathering on chemical fingerprinting. (Cejas Dec. at ¶¶ 27-30, 33, 35; Shoecraft Dec. Ex 14 at 250-251 [ECF No. 115-1.]) Although LKQ contends that Cejas' forensic chemical analysis is significantly flawed because it referenced asphalt pavement signatures, LKQ's own expert, Dr. Douglas, concluded that the asphalt-like material in the samples were caused by road paving operations rather than LKQ. Cejas rebukes Dr. Douglas' conclusion, pointing out that the asphalt pavement diagnostic signatures could not have been from the asphalt paving because that did not happen until December 2017 and the samples were collected in May and June of 2017. (Cejas Dec. at ¶ 23 [ECF No. 115-4.])

Cejas has demonstrated that his opinions rest on reliable methodology regarding the chemical matching process and multiple lines of evidence to show forensic chemical linkage where there are two impacted locations with no clear pathway, including peer-review materials regarding the weathering effect of multiple chemical spills.  Whether and to what extent those lines of evidence are sufficiently determinative of the ultimate issue of causation goes to weight, and not admissibility of the evidence.  *Kennedy*, 161 F.3d at 1230.

(b) *McCue*

10

1       Plaintiff has provided sufficient support for McCue's conclusion that LKQ is

2   the traceable source of the contamination for purposes of summary judgment.

3   McCue's top-line conclusion that the "LKQ facility is the source of contamination

4   encountered in groundwater" is supported by sufficiently reliable methodology.

5   McCue has been a California Certified Hydrogeologist since 1996 and has over 34

6   years of environmental consulting experience relating to the "fate and transport of

7   contaminates in soil, soil gas, and groundwater." (McCue Dec. at ¶ 2 [ECF No. 115-

8   2.])  In his December 3, 2021, expert report, McCue described the method undertaken

9   for the groundwater assessment:

> Sumps and storm drain trench cutoff walls were installed to assess ongoing
> contamination in groundwater and to mitigate the flow of contaminated ground
> water to the Otay River via the installed trench, respectively. The sumps are
> located approximately 100 to 120 feet from the LKQ facility. MTBE, BTEX,
> and total VOC concentrations in the sumps have been as high as 2,200 ug/L,
> 13,730 ug/L and 17,403 ug/L, respectively (Table 2). These data indicate the
> presence of a fuel hydrocarbon source. Further assessment activities were
> conducted on Site in 2017 and 2018 to assess the impact of the contaminated
> groundwater on the Site.
> . . .
> These sump and soil gas results warranted further investigation of the area,
> specifically the LKQ facility to assess if it is the source of the fuel
> hydrocarbons in groundwater and soil gas.
>
> Four soil borings, two of which were converted to groundwater monitoring
> wells were drilled adjacent to the eastern boundary of the LKQ facility. The
> borings/wells are SB-HR01, MW-HR02, SB-HR03, and MW-HR04. Soil
> contamination was encountered as shallow as 10 fbg and deeper down to
> groundwater, which fluctuates in this area from approximately 35 to 60 fbg.
> *Finding contaminated soil at such a shallow depth of 10 to 15 fbg indicated that
> a release had occurred very close to that location. The LKQ facility was the
> only potential source of the contamination at that shallow depth.* For this
> reason, assessment of the LKQ property was warranted.
>
> As discussed in the Background Section, TRC conducted a limited assessment
> of soil and groundwater on the LKQ facility. Five shallow soil borings were
> advanced to depths of 0.8 to 5 fbg (HAB-01, HAB-02, HAB-04, HAB-05 and
> HAB-06); and one groundwater monitoring wells, SDR-02, was drilled and

1
2
installed (Figure 2). Soil and groundwater sampling was conducted, and the
samples were variously tested for GRO, DRO, and VOCs (Tables 4 and 5).

3
4
5
6
Contaminated soil was encountered from ground surface, into groundwater at
approximately X fbg, and to 50 fbg, the bottom of the boring. *This indicates the
LKQ facility is the source of contamination encountered in groundwater*. Light
Non-Aqueous Phase Liquids (LNAPLs) generally referred to as free product,
was encountered in the bore hole during sampling.

7
(Gee Declaration Ex G at 53-54 [ECF No. 94-2.])(emphasis added).

8
9
10
11
12
13
14
15
16
17
18
19
McCue supports his conclusion by referencing a 2016 GEOCON investigation
of Village 3 which located the groundwater table to be in excess of 100 feet below the
lowest graded earth. (McCue Dec. at ¶ 6).  Samples of the perched groundwater from
the Trench were analyzed by EnviroMatric Analytical, utilizing USEPA Methods
8015B and 8260B, which McCue states are standard practice for assessing petroleum
and hydrocarbons and VOC's in soil and groundwater. (McCue Dec. at ¶15). The
results of those tests revealed that the perched groundwater was contaminated with
petroleum hydrocarbons and fuel related VOC's. (*Id*. at ¶16). As a result of these
findings, McCue concluded that the contamination was "attributable to releases of
petroleum products like gasoline, diesel, and oil into the environment, where these
substances migrated into the perched groundwater." (*Id*. at ¶16).

20
21
22
23
24
25
26
McCue noted that a comparison of the free product seen in the LKQ
groundwater monitoring well SDR-02 and the free product in the Trench were visually
identical. (McCue Dec. at ¶ 12). In his December 3, 2021, report, McCue analyzed the
soil and groundwater data, opining that "all the locations are contaminated with fuel
hydrocarbons, including BTEX, fuel oxygenates including MTBE, and some solvent
chemicals (Table 1, 2, 3, 4a and 5)." (Gee Dec, Ex G at 55 [ECF No. 94-2.]) From this
data, the company for whom McCue worked, TRC, concluded that the contamination

27
28

was traced from the Stormwater Trench to the LKQ property.[2] (*Id.*) An expert in hydrogeology would reasonably rely on geological data from GEOCON, groundwater analysis performed by EnviroMatric Analytical, and on his own knowledge of groundwater contamination patterns to reach these conclusions. Accordingly, McCue's opinions are drawn from "objective, verifiable evidence." *Daubert v. Merrell Dow Pharmaceuticals. Inc*., 43 F.3d 1311, 1318 (9th Cir. 1995).

Accordingly, the expert reports of Cejas and McCue are admissible. The conclusions reached by both experts regarding chemical matching of groundwater samples at the LKQ property and Village 3 provide sufficient admissible evidence to raise a genuine issue of material fact with regard to causation of the groundwater contamination at the Village 3 site. *Anderson*, 477 U.S. at 248.

### (c) "Percolation Pond"

LKQ further argues that a 2016 aerial Google Earth photograph shows a stormwater percolation pond due north of the Stormwater Trench that appeared green, like the green color of the Stormwater Trench, and argues that the contamination in the Trench could have been caused by an algae bloom from residual fertilizer and sunlight, or stormwater runoff, which is a more plausible explanation for the contamination than it coming from the LKQ facility to the west. (Mot. at 15).

Plaintiff HomeFed responds that the basin was created during the rough grading of Village 3 as a source of water for the trucks used to spray water onto the surface, was drained each day, filled each night, and therefore no standing water existed for any significant period of time that could create an "algae bloom." (Oppo. at 19). HomeFed further argues that it would be impossible for an algae bloom in the pond to migrate through subsurface groundwater and reemerge in the Stormwater Trench, and

---

[2] To the extent HomeFed purports to add additional support for a migration theory in McCue's June 10, 2022, expert report that was not presented in the original report, that information is excluded under *Daubert* and FRE 26. Instead, Plaintiff must rely on McCue's original report.

instead the most likely source of the green color is the chemical Fluorescein, an ingredient present in commercial antifreeze. (*Id.*)

Plaintiff has provided sufficient evidence to support its argument that the percolation pond was not the source of contamination at the Trench to raise a genuine issue of material fact. In his declaration, McCue states "Dr. Douglas provides no explanation of how algae laden water could have migrated from the retention basin (percolation pond) to the vicinity of the storm drain trench" and that:

> In over thirty years of experience conducting groundwater investigations in San Diego as well as other areas in South California, I have never encountered nor heard of algae migration in groundwater, nor have I ever heard of algae being associated with gasoline related chemicals like MTBE and BTEX. Algae in retention basins does not percolate to the subsurface because the bottom of retention basins accumulate sand and fine sediment that would naturally filter the algae out of the percolating surface water.

(McCue Dec. at ¶ 49 [ECF No 115-2.])

In addition, Curt Smith, Vice President of Community Development for HomeFed Corporation, provided a Google Earth image of the "percolation pond" taken in November 2016 and disputed Douglas' conclusion that the contamination was due to an "algae bloom" or "storm water" runoff. (Smith Dec. at ¶ 8 [ECF No. 115-5.]) Smith states that no substantial volume of water was present for a significant amount of time because

> the company's grading contractor utilized water trucks on a daily basis to spray water onto the surface of the Property to aid in the compaction of fill and to control dust. In order to expedite the refilling of these water trucks, the basin was excavated. Each night, the basin would be filled with water from the Otay Water District's water supply system. Over the course of the following day, the basin would be drained to fill up the trucks, and the process of refilling the basin would be repeated the following night.

(Smith Dec. at ¶ 11[ ECF No. 115-5.])

Smith also refutes Douglas' contention that a City of Chula Vista Notice directed to HomeFed shows that "stormwater runoff" and its attendant pollutants migrated to the percolation ponds and resulted in green algae blooms stating "the

notice identified by Dr. Douglas did not relate to any findings by the City of Chula Vista that HomeFed had allowed storm water runoff to enter a percolation pond, or had allowed algae blooms to propagate at the Property." (*Id*. at ¶17, 18). By demonstrating that there is a dispute regarding the assertion that the "percolation pond" or "storm water" runoff caused the contamination in the Trench rather than LKQ, this claim survives summary judgment.

For the foregoing reasons, the Court denies summary judgment.

### 2.  *Standing for Public Nuisance*

To allege standing in a public nuisance claim, a private citizen must allege a special injury that is "different in kind, rather than degree, than that suffered by the general public." Cal. Civ. Code § 3493; *Venuto v. Owens-Corning Fiberglass Corp*., 22 Cal. App. 3d 116, 124 (1971). "The public nuisance doctrine is aimed at the protection and redress of *community* interests and, at least in theory, embodies a kind of collective ideal of civil life[.]" *People ex rel. Gallo v. Acuna*, 60 Cal.Rptr.2d 277, 284 (1997)(emphasis in original). The interference must be both substantial and unreasonable. *Acuna*, 60 Cal.Rptr.2d at 285. "A substantial interference is 'a real and appreciable invasion of the plaintiff's interests.'" *Araujo v. Coachella Valley Water District*, 2021 WL 6113744, *3 (S.D. Cal. 2021) (citing *Acuna*). Courts employ an objective standard when determining whether an invasion is unreasonable, asking "'whether reasonable persons generally, looking at the whole situation impartially and objectively, would consider it unreasonable.'" *San Diego Gas & Electric Co. v. Superior Court*, 13 Cal.4th 893, 938 (1996).

LKQ argues that HomeFed has not established standing to pursue its public nuisance claim because it is the sole owner of the property, and therefore the only party harmed by the discovery of contaminated groundwater at the site. (Mot. at 17). Further, LKQ claims that the HomeFed Site is in the Otay Valley Hydrologic Area, is designated by the California Regional Water Quality Control Board ("RWQCB") to include only "beneficial uses for industrial supplies and is excepted from municipal

15

supply" indicating that the contamination does not interfere with the community at large, including as a drinking water source. (*Id*.)

In response, HomeFed contends that LKQ ignores the fact that the groundwater contamination now has a preferential pathway to contaminate surface waters, specifically the Otay River. (Oppo. at 23). The Otay River has been designated by the RWQCB as including "non-contact recreation" and "potential" "contact water recreation" as beneficial uses including picnicking, hiking or other potential recreational activities involving bodily contact with water, therefore, Plaintiff argues it is for a jury to determine whether the risk of contaminated water flowing into the Otay River would interfere with the public's use of the River. (*Id*.)

Plaintiff has sufficiently asserted standing by providing admissible evidence in support of its contention that the threatened harm to Otay River is a substantial and unreasonable interference with the customary use of the River, and that it has suffered harm that is "different in kind, rather than degree, than that suffered by the general public." *Venuto*, 22 Cal. App. 3d at 124. Plaintiff contends that contaminated water is bypassing the cutoff walls which could result in the soil contaminated with gasoline and other toxic chemicals reaching the Otay River through preferential hydrologic channels, thereby interfering with the public's enjoyment of the River. In McCue's declaration, he explained that testing of Sump 3, which is downstream of the two cutoff walls in the storm drain trench, on September 3, 2020, demonstrated that groundwater samples contained MTBE which indicated that perched groundwater is able to bypass the cutoff walls, or is entering the trench below the lower cutoff wall. (McCue Dec. at ¶ 28-30).

LKQ argues that McCue's findings regarding contaminated groundwater flowing around the containment wall was not presented in his original expert report and contradicts his earlier expert report, therefore, it must be excluded under FRE 702 and *Daubert*.  (*Id*. at 8-9). Despite LKQ's contentions, McCue's declaration is consistent with his December 2021 expert report and prior deposition testimony and

should not be excluded under *Daubert*. In the December report, McCue described the measures taken to prevent contaminated water from traveling to the Otay River, and indicated that additional testing would be required in the future. He opined,

> [t]he purpose of the containment measures was to mitigate contaminated groundwater migration through the gravel backfill of the storm drain trench. The cut off walls retard the migration of contaminated water that enters the storm drain trench. The long-term effectiveness of the cut off wall system is unknown. Long term monitoring of the sumps will be required until the source of the contamination is mitigated or remediated.

(Gee Dec., Ex. G at 20).)

Similarly, McCue's prior deposition testimony does not contradict his findings in the declaration, because he noted, "it's important to understand how these concentrations are changing over time. So, yes, these sumps should probably be sampled again in the future." (Gee Dec., Ex. M at 203:6-16 [ECF No. 94-2.]) The later assessment of groundwater seeping around the containment walls is consistent with his statement that long-term monitoring will be required and that the sumps would be sampled again in the future. Accordingly, the assertions in McCue's declaration regarding the discovery that contaminated groundwater was seeping around the containment measures is admissible.

The evidence that contaminated groundwater may seep around the containment measures shows that it could reach the Otay River. The RWQCB Basin Plan for San Diego which "has designated beneficial uses for Agriculture Supply, Non-contact Water Recreation, Warm Freshwater Habitat, Wildlife Habitat, and Rare, Threatened, or Endangered Species" indicating multiple beneficial community uses of the River which could be threatened by contaminated soil. (McCue Dec. at ¶ 21). This is sufficient to show standing for purposes of summary judgment despite the absence of current contamination of the River. *In re Firearm Cases*, 126 Cal.App.4th 959, 988 (2005) (A public nuisance "may be enjoined because harm is threatened that would be

significant if it occurred, and that would make the nuisance actionable under the rule here stated, although no harm has yet resulted.")

Plaintiff has further shown that it suffered harm different in kind and character from the harm to the community because it incurred substantial expenses in monitoring and removing the contaminated soil, as demonstrated by Robert Penner, Vice-President of Asset Management and Senior Financial Analyst for HomeFed Corporation LLC. He states:

> Within days of encountering the highly contaminated groundwater (which contained free product mixed in with the water) I engaged TRC Solutions as our environmental consultants to begin investigating and assessing the situation. Shortly thereafter, I directed HomeFed Village III to enroll in the County of San Diego, Department of Environmental Health ("DEH"), Land and Water Quality Division's Voluntary Assistance Program on or about May 25, 2017 so that HomeFed Village III would have regulatory oversight of our site investigation and assessment. The total amount paid to TRC for its work specific to assessing this contamination is approximately $568,680.00.

(Robert Penner Dec. at ¶ 13 [ECF No. 115-3.]) In addition, HomeFed incurred additional expenses in constructing makeshift containment systems, as noted here:

> We installed two "cutoff walls" within the trench, just downstream from the location where the contaminated water was infiltrating into the trench, and installed sumps near the base of these walls to pump out water collecting behind the wall. A third sump was installed on the downstream side of the second cutoff wall, and a fourth sump was installed further downstream, near the location where the storm drain pipe discharges into the retention basin. The costs associated with this work totaled $235,234.00 paid to Cass Construction, the site utility contractor, and $75,000.00 paid to Hunsaker & Associates, the civil engineer, for redesigning Heritage Road.

(*Id*. at ¶17). More expenses were incurred "[b]etween 2017 and 2019 [when] HomeFed Village III pumped 557,100 gallons of contaminated groundwater from the sumps which was hauled away and disposed of off site by an environmental contractor, NRC, at a cost of $735,420.68." (*Id*. at ¶ 18). This evidence demonstrates that the harm Plaintiff suffered is different in kind and character than that of the

community at large and supports a finding of standing for the public nuisance for summary judgment purposes. Accordingly, Plaintiff has sufficiently alleged standing for purposes of this summary judgment motion.

### B. RCRA Claim

The Citizen Suit provision of RCRA, 42 U.S.C. § 6972(a)(1)(B), allows "any person" to commence a civil action on his own behalf against "any person," "including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an *imminent and substantial endangerment* to health or the environment." (Emphasis added).

Pursuant to 42 U.S.C. § 6903(3), the term "disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." Pursuant to 42 U.S.C. § 6903(27), "solid waste" means any "discarded material, including solid, liquid [or] semisolid … material resulting from resulting from industrial, commercial, mining, and agricultural operations, and from community activities[.]" "A finding of 'imminency' does not require a showing that actual harm will occur immediately so long as the risk of threatened harm is present: 'An 'imminent hazard' may be declared at any point in a chain of events which may ultimately result in harm to the public.'" *Price v. U.S. Navy*, 39 F.3d 1011, 1019 (9th Cir. 1994).

LKQ argues that HomeFed has not shown through admissible evidence that any endangerment currently exists or is likely to exist in the future, but instead, the RCRA claims are based on the 2017 Stormwater Trench incident which is "wholly past." (Mot. at 18-19). LKQ further contends that HomeFed has presented no evidence of the likelihood of contaminated groundwater traveling to the Otay River, and has produced

19

no evidence that even if contaminated groundwater made its way from the HomeFed site to the River that it would cause any harm to the River. (*Id.* at 21-22). In addition, LKQ contends that Plaintiff's expert McCue did not research whether the Otay River was impaired by oil and grease contamination or determine whether or not a Total Daily Maximum Load ("TMDL")[3] was exceeded by the alleged petroleum release. This makes it impossible for HomeFed to establish any endangerment to human health or the environment if more contaminated groundwater was discovered in the Stormwater Trench, according to LKQ. (*Id.* at 22-23).

Plaintiff HomeFed contends that LKQ misstates the nature of the RCRA claim, noting that the claim is based on past and ongoing disposals of solid waste, not a one-time incident. (Oppo. at 24). Plaintiff further asserts that there is a genuine issue of material fact regarding whether past or present waste disposal from LKQ may present an imminent and substantial endangerment to the environment because (1) the releases were ongoing, (2) there is evidence that the contaminated groundwater has made its way around the engineering controls put in place, and (3) no quantities of any amount may enter the Otay River because those substances are "hazardous to aquatic life." (Oppo. at 25; McCue Dec. at 11:22-12:14, 26:1-8; 9:8-17). HomeFed claims that there were hundreds of gallons of contaminated water in the trench behind the containment wall at the time the motion was filed, and that if the water table rises it will "overwhelm the cutoff walls and flow into the Otay River." (*Id.* at 26; McCue Dec. at 26:1-8).

The Court finds that Plaintiff has provided sufficient admissible evidence to raise a genuine issue of material fact with regard to whether the contaminated

---

[3]"A TMDL is the calculation of the maximum amount of a pollutant allowed to enter a waterbody so that the waterbody will meet and continue to meet water quality standards for that particular pollutant." U.S. Environmental Protection Agency, Overview of Total Maximum Daily Loads (TMDLs), https://www.epa.gov/tmdl/overview-total-maximum-daily-loads-tmdls (last visited June 21, 2023)

groundwater at the HomeFed site may present an imminent and substantial endangerment to the environment under RCRA. In explaining how the contaminated groundwater may cause an imminent endangerment to the Otay River, McCue attests to his personal knowledge, including his involvement as Principal Hydrogeologist since 2017 on behalf of HomeFed. (McCue Dec. at ¶ 2). McCue states that ongoing releases of contaminants have infiltrated the soil noting that "the presence of 3.35 feet of gasoline floating on top of the perched groundwater suggests multiple prolonged releases of gasoline onto the ground surface occurring over a period of many years." (McCue Dec. at ¶ 45 [ECF No. 115-2.]) According to McCue, "the existence of a preferential pathway for the contaminated perched groundwater discovered at Village 3 to reach the Otay River means any past, present, or future releases of oil or petroleum products that have causes or contributed to the presence of free product in that perched groundwater may present an imminent and substantial endangerment to the environment." (*Id*. at ¶ 22). Testing of Sump 3, which is downstream of the two cutoff walls in the storm drain trench, on September 3, 2020, demonstrated that groundwater samples contained MTBE which indicated that perched groundwater is able to bypass the cutoff walls, or is entering the trench below the lower cutoff wall. (*Id*. at ¶ 28-30). As a result, McCue opines that the "the existence of free product and contaminated perched groundwater may present an imminent and substantial endangerment to the environment. (*Id*. at ¶ 30).

Though LKQ argues that there is no evidence that contaminated groundwater would cause any harm to the River because the River contains a large volume of water and the quantities of oil found at the Stormwater Trench previously were quite small, that is not the proper standard. A substantial endangerment does not require quantification but instead, "endangerment is substantial if there is some reasonable cause for concern that someone or something may be exposed to a risk of harm by a release or a threatened release of a hazardous substance if remedial action is not taken." *California Dept. of Toxic Substance Control v. Interstate Non-Ferrous Corp.,*

298 F.Supp. 2d 930, 980 (E.D. Cal. 2003). The Section 401 permit issued by the Regional Water Quality Control Board pursuant to the Clean Water Act clearly states that "substances hazardous to aquatic life including, but not limited to, petroleum products… must be prevented from contaminating the soil and/or entering waters of the United States and/or State." (Shoecraft Dec., Ex 9 at 209). The Section 401 permit further provides that *any* discharge of oil or petroleum product in waters must be immediately reported. (*Id*. at p. 221)(emphasis added).

Plaintiff has accordingly introduced sufficient admissible evidence to raise a genuine issue of material fact regarding whether contaminated perched groundwater may create a substantial and imminent endangerment to the environment under the RCRA. *Anderson*, 477 U.S. at 248.

V.   CONCLUSION AND ORDER

For the foregoing reasons, Defendant LKQ's Motion for Summary Judgement is DENIED

IT IS SO ORDERED.

Dated:  July 11, 2023

Hon. M. James Lorenz
United States District Judge

22