UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOMEFED VILLAGE III MASTER, LLC; <br><br> Plaintiff, <br><br> vs. <br><br> OTAY LANDFILL, INC et al; <br><br> Defendants. | Case No. **3:20-cv-0784-L-JLB** <br><br> **ORDER DENYING PLAINTIFF HOMEFED'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING MOTION FOR AN ORDER TREATING SPECIFIED FACTS AS ESTABLISHED [ECF NO. 95]** |

Pending before the Court is Plaintiff HomeFed's ("HomeFed") Partial Motion for Summary Judgment or in the Alternative, Motion for an Order Treating Specified Facts as Established on Plaintiff's Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, et seq. claim. [ECF No. 95]. Defendants Otay Landfill ("OLI") and Recycling International dba LKQ Pick Your Part ("LKQ") each filed a Response in Opposition, and Plaintiff HomeFed filed Replies to the Oppositions. The matter is submitted on the briefs without oral argument. *See* Civ. L. R. 7.1(d)(1). For the reasons stated below, Plaintiff's Motions are denied.

//

I.   PERTINENT FACTUAL BACKGROUND

Plaintiff HomeFed, is the master develop of a 436-acre residential and commercial subdivision in the City of Chula Vista, consisting of 900 single-family homes plus apartments and commercial structures, called Village III. Village III is bordered on the north by Defendant OLI's landfill and on the west by LKQ's auto salvage yard.

In 2017, Plaintiff encountered groundwater contaminated with oil and fuel products while excavating a trench for the installation of a storm drain. HomeFed engaged expert hydrogeologist Gary McCue after the discovery of the contaminated water and constructed sumps and storm drain trench cutoff walls to assess ongoing contamination and mitigate the flow of contaminated ground water to the Otay River.

According to the Complaint, LKQ's day-to-day business operations result in oil, gasoline, and vehicle fluids spilling and leaking onto the ground of the vehicle processing yard and these contaminants are absorbed by the soil, migrate downwards, contaminate the subsurface soil, finally reaching an aquifer of perched groundwater at a depth of approximately 32 feet below the surface. This perched groundwater is coated by a thick layer of "free product" and is contaminated with gasoline, MTBE, BTEX, and volatile organic compounds (VOCs). This table of contaminated perched groundwater extends beyond the boundary of the LKQ facility and onto Plaintiff's property. According to the Complaint, contaminated water has escaped from the confines set in place by barriers and now has a direct pathway through Plaintiff's property to the Otay River, a habitat for plants and wildlife, and may present an imminent and substantial endangerment to human health and the environment.

The results of groundwater testing were given to the County of San Diego Department of Environmental Health ("DEH") who required additional soil gas testing to assess potential risk from vapor phase intrusion. (*Id*. at ¶ 15).  The decomposition of solid waste at landfills generates methane, which can migrate outwards from the waste mass through the subsurface soil. Methane is an explosion

hazard in enclosed areas. Excessive concentrations of methane in the soil gas beneath structures threatens the health and safety of building occupants, because methane can accumulate in those structures and blow them up. Landfill operators are required by state and federal law to control the generation and migration of methane to ensure that the concentration of methane in soil gas at the perimeter of the landfill does not exceed the "lower explosive limit" for methane, which is 5% by volume in air, or 50,000 parts per million by volume (ppm). McCue's company TRC installed gas probes which revealed impacted soil gas in some probes at Village III.

The Complaint avers that past and present disposal of waste at Defendant OLI's landfill creates dangerous levels of methane which travels through geological pathways to neighboring property, including HomeFed's property, and may present an imminent and substantial endangerment to human health.

II. RELEVANT PROCEDURAL BACKGROUND

On April 24, 2020, Plaintiff HomeFed Village III filed the original Complaint in this action seeking declaratory and injunctive relief, or damages, for Defendants violations of the RCRA, and common law theories of public nuisance, private nuisance, and trespass. [ECF No. 1.]

On May 11, 2020, Plaintiff filed a First Amended Complaint. (FAC [ECF No. 4.]) Defendant LKQ filed a motion to dismiss on July 13, 2020, which was deemed moot by a subsequent joint motion on July 27, 2020. [ECF No. 17.] Plaintiff was allowed to amend the complaint and filed a Second Amended Complaint ("SAC") on August 6, 2020. [ECF No. 18.] Plaintiff seeks declaratory and injunctive relief for investigation and implementation of a permanent remedy that will eliminate the migration of contamination from OLI to Village III. (SAC at 22).

On August 15, 2022, Plaintiff HomeFed filed the present Motion for Partial Summary Judgment on the RCRA claim, or in the Alternative, for an Order Treating Specified Facts as Established. [ECF No. 95.] On September 12, 2022, Defendant LKQ filed a Response in Opposition. (LKQ Oppo. [ECF No. 116.] Also on September 12,

2022, Defendant OLI filed a Response in Opposition. (OLI Oppo [ECF No. 117.] On September 19, 2022, Plaintiff filed a Reply to Defendant LKQ's Opposition [ECF No. 120] and a Reply to Defendant OLI's Opposition. [ECF No. 121.]

### III.  LEGAL STANDARD

Rule 56(a) allows a party to move for partial summary judgment. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322–23. If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970).

If the moving party meets the initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elect. Indus. Co., Ltd. v Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the nonmoving party must "go beyond the pleadings" and by "the depositions, answers to interrogatories, and admissions on file," designate

1  "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at
2  324 (quoting Fed. R. Civ. P. 56(e)).

3        The court must draw all inferences from the underlying facts in the light most
4  favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587. "Credibility
5  determinations, the weighing of evidence, and the drawing of legitimate inferences
6  from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a
7  motion for summary judgment." *Anderson*, 477 U.S. at 255.

8        "[T]he district court may limit its review to the documents submitted for the
9  purpose of summary judgment and those parts of the record specifically referenced
10 therein." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir.
11 2001). The court is not obligated "to scour the record in search of a genuine issue of
12 triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (*citing Richards v.
13 Combined Ins. Co. of Am.*, 55 F.3d 247, 251 (7th Cir. 1995)).

14     IV.   D<small>ISCUSSION</small>

15       The Citizen Suit provision of RCRA, 42 U.S.C. § 6972(a)(1)(B), allows any
16 person to commence a civil action on his own behalf against any person, "including
17 any past or present generator, past or present transporter, or past or present owner or
18 operator of a treatment, storage, or disposal facility, who has contributed or who is
19 contributing to the past or present handling, storage, treatment, transportation, or
20 disposal of any solid or hazardous waste which *may* present an *imminent and
21 substantial endangerment* to health or the environment." (Emphasis added).

22       To establish liability under RCRA, a court must find: "(1) that the defendant
23 'ha[s] contributed to the past or [is] contributing to the present handling, treatment,
24 transportation, or disposal' of certain material; (2) that this material constitutes "solid
25 waste" under RCRA; and (3) that the solid waste 'may present an imminent and
26 substantial endangerment to health or the environment.'" *California River Watch v.
27 City of Vacaville*, 39 F.4th 624, 629 (9th Cir. 2022). The Ninth Circuit has held that
28 "contribution" requires "that a defendant be actively involved in or have some degree

of control over the waste disposal process to be liable under RCRA." *Hinds Investments, L.P. v. Angioli*, 654 F.3d 846, 851 (9th Cir. 2011). Thus, district courts have found that "causation is a part of the contribution element." *City of Imperial Beach v. International Boundary & Water Commission*, 337 F.Supp. 3d 916, 931 (S.D. Cal. 2018).

Pursuant to 42 U.S.C. § 6903(3), the term "disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." Pursuant to 42 U.S.C. § 6903(27), "solid waste" means any "discarded material, including solid, liquid [or] semisolid … material resulting from resulting from industrial, commercial, mining, and agricultural operations, and from community activities[..]

The party seeking redress does not need to show "that actual harm will occur immediately so long as the risk of threatened harm is present: 'An 'imminent hazard' may be declared at any point in a chain of events which may ultimately result in harm to the public.'" *Price v. U.S. Navy*, 39 F.3d 1011, 1019 (9th Cir. 1994). The endangerment provision broadly permits relief "that ameliorates present or obviates the risk of future 'imminent' harms." *Ecological Rights Foundation v. Pacific Gas & Electric Company*, 874 F.3d 1083, 1089 (9th Cir. 2017)(citing *Meghrig v. KFC Western, Inc.,* 516 U.S. 479, 486 (1996).). District courts have found that a substantial endangerment does not require quantification but that an endangerment is considered substantial "if there is some reasonable cause for concern that someone or something may be exposed to a risk of harm by a release or a threatened release of a hazardous substance if remedial action is not taken." *California Dept. of Toxic Substance Control v. Interstate Non-Ferrous Corp.*, 298 F.Supp. 2d 930, 980 (E.D. Cal. 2003); *Buggsi, Inc., v. Chevron U.S.A., Inc.*, 857 F.Supp. 1427 (D. Ore. 1994).

Plaintiff argues that Defendant LKQ has and continues to dispose of oil and other chemicals related to the dismantling of automobiles on its property adjacent to the HomeFed Village III site which may present an imminent and substantial endangerment to the health of individuals and to the beneficial uses of the Otay River. Plaintiff argues that Defendant OLI has and continues to release methane at dangerous levels near to and on Plaintiff's property and the disposal of this waste may present an imminent and substantial endangerment to the health of individuals occupying the adjacent property and the environment. Plaintiff relies on the expert opinions of hydrogeologist Gary McCue to support these assertions. Both Defendants LKQ and OLI challenge McCue's findings, arguing that his opinions should be excluded under *Daubert* and Rule 702. Because McCue's opinions form the basis of Plaintiff's claims, the Court addresses the challenges to his methodologies and experience at the outset.

  A. McCue's Expert Opinions

In *Daubert* the Supreme Court held that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to "ensure that any and all scientific testimony ... is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)). FRE 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed.R.Ev. 702. When determining whether an expert's methodology is reliable, a court should consider factors such as "testing, peer review, error rates, and 'acceptability' in the relevant scientific community." *Kumho Tire Co.,* 526 U.S. at 141 (citing *Daubert*, 509 U.S at 593–94). "The test is whether or not the reasoning is scientific and will assist the jury. If it satisfies these two requirements, then it is a matter for the finder of fact to decide what weight to accord the expert's testimony." *Kennedy v. Collagen Corp.*, 161 F.3d

1226, 1230 (9th Cir.1998). "As one court has summarized: 'Disputes as to the strength of [an expert's] credentials, faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony.'" *Id*. (citing *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir.1995).)

### 1. LKQ Challenges to McCue's Opinions

LKQ argues that McCue's Opinion 3 in the December 3, 2021, expert report that "past and present waste discharges. . . at the LKQ Facility present an imminent and substantial endangerment to health and/or the environment" should be excluded because he ignored relevant data resulting in flawed methodology. (LKQ Oppo. at 17). According to LKQ, McCue failed to consider the San Diego Regional Water Board's EPA-approved Total Maximum Daily Load[1] ("TMDL") to determine whether the Otay River is impaired by grease and oil chemicals and whether there is a limit as to how much oil and grease can be released into the Otay River before it harms the environment. (*Id*. at 18). LKQ states: "without actually using the Stormwater Trench groundwater sampling data collected by TRC in 2017 and 2018 to estimate the amount of contamination that he alleges could reach the Otay River or the amount of contamination that the Otay River could receive without harming the river, Mr. McCue cannot reliably opine that water released from the HomeFed site causes an imminent and substantial endangerment to the Otay River Watershed." (*Id*. at 19). OLI argues that McCue simply renders a conclusory opinion that there is a "potential risk." (*Id*.)

---

[1] "A TMDL is the calculation of the maximum amount of a pollutant allowed to enter a waterbody so that the waterbody will meet and continue to meet water quality standards for that particular pollutant." U.S. Environmental Protection Agency, Overview of Total Maximum Daily Loads (TMDLs), https://www.epa.gov/tmdl/overview-total-maximum-daily-loads-tmdls (last visited June 21, 2023)

8

Contrary to LKQ's assertions, it is not fatal to McCue's opinion that he did not consider the TMDL in reaching his conclusion. A determination of whether the Otay River is currently contaminated by reference to the TMDL is not necessary because a threat of *future* harm is sufficient under RCRA. *Meghrig,* 516 U.S. at 485-86("there must be a threat which is present now, although the impact of the threat may not be felt until later").  To determine whether there was a present threat, McCue analyzed the presence of fuel contaminates in the samples from LKQ and Plaintiff's property, determined the contaminated water was moving laterally via preferential pathways, and found evidence that the contaminated water was bypassing sumps and other preventative measures thereby creating a potential endangerment to the Otay River for purposes of an RCRA claim. Accordingly, McCue's scientific opinions are drawn from "objective, verifiable evidence." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1228 (9th Cir. 1998)(citing *Daubert v. Merrell Dow Pharmaceuticals. Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995)).

LKQ argues that McCue's Opinion 2 in his December 3, 2021 expert report that "[p]ast and ongoing waste discharges at the LKQ facility have resulted in contaminated soil, groundwater and soil gas onto the Site" must be excluded because he fails to provide any methodology or other support as a basis for his conclusion. (LKQ Oppo. at 20).

McCue's conclusion is supported by sufficiently reliable methodology. McCue has been a California Certified Hydrogeologist since 1996 and has over 34 years of environmental consulting experience relating to the "fate and transport of contaminates in soil, soil gas, and groundwater." (McCue Dec. at ¶ 2 [ECF No. 115-2.])  In his December 3, 2021, expert report, McCue described the method undertaken for the groundwater assessment which included the installation of sumps and storm drain trench cutoff walls which assisted in the assessment of groundwater contamination and to mitigate the flow of contaminated ground water to the Otay River. He reported that the total VOC concentrations in the sumps were as high as

9

2,200 ug/L, 13,730 ug/L and 17,403 ug/L, and indicated the presence of a fuel hydrocarbon source. Ongoing assessments were conducted in 2017 and 2018 to assess the impact of the contaminated groundwater on the Site which indicated that a release had occurred very close to that location. McCue determined the LKQ facility was the only potential source of the contamination at that shallow depth leading to assessment of the LKQ property. (Gee Declaration Ex G at 53-54 [ECF No. 94-2.])(emphasis added).

      McCue supports his conclusion by referencing a 2016 GEOCON investigation of Village 3 which located the groundwater table to be in excess of 100 feet below the lowest graded earth. (McCue Dec. at ¶ 6). Samples of the perched groundwater from the Trench were analyzed by EnviroMatric Analytical, utilizing USEPA Methods 8015B and 8260B, which McCue states are standard practice for assessing petroleum and hydrocarbons and VOC's in soil and groundwater. (McCue Dec. at ¶15). The results of those tests revealed that the perched groundwater was contaminated with petroleum hydrocarbons and fuel related VOC's. (*Id*. at ¶16). McCue noted that a comparison of the free product seen in the LKQ groundwater monitoring well SDR-02 and the free product in the Trench were visually identical. (McCue Dec. at ¶ 12). McCue analyzed the soil and groundwater data, opining that "all the locations are contaminated with fuel hydrocarbons, including BTEX, fuel oxygenates including MTBE, and some solvent chemicals (Table 1, 2, 3, 4a and 5)." (Gee Dec, Ex G at 55 [ECF No. 94-2.])

      As a result of these findings, McCue concluded that the contamination was "attributable to releases of petroleum products like gasoline, diesel, and oil into the environment, where these substances migrated into the perched groundwater." (*Id*. at ¶16). From this data, the company for whom McCue worked, TRC, concluded that the contamination was traced from the Stormwater Trench to the LKQ property. (*Id*.) An expert in hydrogeology would reasonably rely on geological data from GEOCON, groundwater analysis performed by EnviroMatric Analytical, and on his own

knowledge of groundwater contamination patterns to reach these conclusions. Accordingly, McCue's scientific opinions are drawn from "objective, verifiable evidence." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1228 (9th Cir. 1998)(citing *Daubert v. Merrell Dow Pharmaceuticals. Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995)).

### 2. OLI's Challenges to McCue's Opinion

Defendant OLI claims that McCue's opinion should be excluded under Rule 702 and *Daubert* because he has no relevant experience with landfill gas ("LFG") migration and cannot reliably explain how LFG migrates, how to interpret LFG data, or how the potential impacts of LFG can be assessed. (Oppo. at 15). Furthermore, McCue's methodology is unreliable because he exclusively relies on OLI's exceedances to conclude that methane is migrating on to Plaintiff's property and he failed to perform a cumulative risk assessment on Plaintiff's property to support his conclusion that there is any current or likely risk (*Id.* at 17).

The Court does not agree. McCue described the methodology used to analyze gas probe samples, stating

> [t]he samples were analyzed for VOCs using USEPA Method 8260B/SV and for methane using USEPA Method 8015B, which are reliable and the standard of practice for assessing VOCs and methane in soil gas. Samples were analyzed by EnviroMatrix Analytical Inc. (VOCs), H&P Mobile Geochemistry (VOCs and Methane), and SunStar Laboratories, Inc. (methane). Known or suspected human carcinogens were detected in soil gas, including benzene and ethylbenzene.

(*Id.* at ¶ 17).

The basis for McCue's conclusion that OLI was the source of LFG on Plaintiff's property was the presence of preferential geological pathways, which was supported by the findings of "SCS Engineers [who] identified a cause of the landfill gas migration from the waste mass to the perimeter of the landfill property. Based on the evaluation of soil drill cores, a fractured sandstone layer was identified. SCE Engineers state the fractured sandstone may indicate the presence of a series of

preferential migration pathways for LFG coming from the unlined portion of the refuse mass." (*Id*. at ¶ 24).  McCue concluded that

> [t]he presence of methane, VOCs including BTEX, and VOCs specific to the Otay Landfill in the native soils adjacent to the Otay Landfill indicate the contaminated soil gas is not from a natural source such as vegetation buried during Site grading. Based on these lines of evidence, and on my experience, knowledge and skill, I can state with a reasonable degree of scientific certainty that the Otay Landfill is the primary source of methane detected in soil gas at the Site.

(*Id*. at ¶ 27).

Contrary to OLI's contentions, McCue's opinions are based on sufficient reliable scientific bases, including the discovery by SCS engineers of a fractured sandstone layer that creates a preferential pathway for the migration of methane from OLI's property, and not simply from purported exceedances. Although it appears McCue did not conduct a cumulative risk assessment regarding some of the properties in question, OLI cites no binding authority requiring such an assessment. Moreover, the engineers at SCS and the labs that analyzed the samples provided some risk assessment data. Because McCue relied upon "objective, verifiable evidence" to reach his conclusion, Plaintiff has thus established by a preponderance of evidence that a proper foundation exists for admissibility of McCue's expert testimony. *See Daubert*, 43 F.3d at 1318. In light of the Court's findings regarding the admissibility of McCue's opinions, the Court turns to the merits of Plaintiff's motion.

//
//

B.  *Defendant LKQ's Conduct*

Plaintiff argues that it is entitled to summary judgment on the RCRA claim because it is undisputed that (1) Defendant LKQ has discharged or dumped oil, gasoline, and vehicle fluids which constitute "solid waste" onto the land at the LKQ Facility, (2) LKQ is actively involved or has some degree of control over this process, and (3) the solid waste may present an imminent and substantial endangerment to

1   health or to the environment under RCRA. (Mot. at 24-26). The waste disposal from
2   LKQ may present an imminent and substantial endangerment to the environment
3   because it was ongoing, there is evidence that the contaminated groundwater has made
4   its way around the engineering controls put in place, and no quantities of any amount
5   may enter the Otay River because those substances are "hazardous to aquatic life."
6   (Mot. at 25; McCue Dec. at 11:22-12:14, 26:1-8; 9:8-17). HomeFed claims that there
7   were hundreds of gallons of contaminated water in the trench behind the containment
8   wall at the time the motion was filed, and that if the water table rises it will
9   "overwhelm the cutoff walls and flow into the Otay River." (Mot. at 26; McCue Dec.
10  at 26:1-8).

11  LKQ responds that HomeFed (1) fails to establish causation under RCRA; (2)
12  claims that "virtually no facts or analysis" are needed to prove an imminent and
13  substantial endangerment which is a mischaracterization of RCRA case law; and (3)
14  relies on inadmissible expert testimony from McCue, as noted above. (Oppo. at 4, 16
15  [ECF No. 116.])

16  The parties have agreed on certain facts for purposes of this motion, including
17  that "LKQ currently uses the LKQ facility for vehicle processing. Oil, gasoline, and
18  vehicle fluids are drained from vehicles at the LKQ facility" and that "[i]n September
19  2021, Plaintiff installed a groundwater monitoring well on the LKQ facility."
20  However, there is disagreement about whether Plaintiff has shown through admissible
21  evidence that there is a preferential pathway for the migration of contamination from
22  LKQ to HomeFed and then to the Otay River sufficient to show that any
23  contamination may present an imminent and substantial endangerment to the
24  environment. The experts have dueling opinions based on scientific data and analysis
25  with LKQ contending that the direction of groundwater flow makes it impossible for
26  contamination to flow from LKQ property to HomeFed property, and HomeFed
27  arguing that preferential pathways allow the contamination to flow from LKQ to
28  HomeFed's property and then on to the Otay River.

LKQ's expert Sin Senh noted that

> According to the expert report of Nicole Sweetland (on behalf of Pacific Waste Services), monitoring wells from two nearby properties (Pavement Recycling at 855 Energy Way and Ecology Auto Wrecking at 825 Energy Way – both west of Heritage Road and the Village 3 Site) indicate that groundwater in this region flows towards the southwest, which is consistent with the local hydrogeology. The Village 3 Site is east of the LKQ property and, therefore, is hydraulically upgradient of the LKQ property; thus, subsurface contamination would flow from the Village 3 Site to the LKQ property. Dissolved contamination detected at the Village 3 Site did not emanate from the LKQ property.

(LKQ Mot. Ex. J at 8 [ECF No. 94-2.])

In contrast, McCue opined that the contaminated groundwater "may move laterally as a continuous, free-phase layer along the upper boundary of the water-saturated zone due to gravity and capillary forces." (McCue Dec. at ¶ 75). This lateral movement can be significant if the "stratum is flat lying where it has a very low angle of dip." (*Id*. at ¶ 77). In support of his conclusion. McCue cited to GEOCON'S 2016 Updated Geotechnical Investigation of the Site which found that

> the Site has generally been unaffected by regional folding or faulting and consists of a broad flat lying plane that has been heavy dissected by the down cutting of canyon drainages. The geologic structure within the sedimentary units at the Site is characterized as locally flat lying. GEOCON added that only regionally does the geologic structure within the sedimentary units have a gentle southwesterly dip generally up to 4 degrees, but the GEOCON crosssections of the geology local to the in Exhibit 46 show no dip.

(Gee Dec. [ECF No. 95-3.]) As a result, McCue opines that the "the existence of free product and contaminated perched groundwater may present an imminent and substantial endangerment to the environment. (*Id*. at ¶ 30).

The Court finds that OLI has introduced sufficient admissible evidence to raise a genuine issue of material fact whether the direction of groundwater flow conclusively shows that LKQ is not the source of contamination. Accordingly, summary judgment is inappropriate on this claim. *See Goldman v. Standard Ins. Co.,* 341 F.3d 1023, 1036 (9th Cir. 2003)("Who is correct in this battle of experts is not for us to decide" on summary judgment.)

B. *Defendant OLI's Conduct*

Plaintiff argues that summary adjudication of the RCRA claim is appropriate as to Defendant OLI because it is undisputed that waste disposals at the OLI landfill are generating dangerous concentrations of methane gas. According to Plaintiff, the methane is migrating through the soil gas to the perimeter of the landfill and may present a threat to the health and safety of the occupants of structures on adjacent properties. (Mot. at 20-22; Reply at 2 [ECF No. 121.]) Plaintiff states it spent $675,000 to construct and install methane mitigation measures on apartments constructed on lots 824 and 825 which has eliminated the threat to the health and safety of occupants on those lots, but if OLI does not control the migration of methane to the perimeter of the landfill, it will be compelled to construct methane mitigation systems on new developments at great cost. (Mot. at 22).

In response, OLI argues that there are disputed facts regarding the source and extent of methane and VOC contamination of Plaintiff's property making summary adjudication of the RCRA claim inappropriate. (Oppo. at 3 [ECF No. 117.]) As noted above, OLI claims that Plaintiff has no admissible expert support as required to support its claim but their experts have opined that: (1) the methane and VOC contamination on Plaintiff's property is from Plaintiff's mass grading operation burying decomposing organics, (2) spatial, temporal, fingerprinting and isotopic analysis confirm that the soil gas found at Plaintiff's property does not match the soil gas on OLI's property; and (3) there is no imminent and substantial endangerment. (*Id*. at 3). Finally, OLI contends that Plaintiff's RCRA claim is not legally viable because it is based on the byproducts of solid waste i.e. methane and VOC's, and not the solid waste itself as required under RCRA. (*Id*.)

The Court finds that there is a genuine issue of material fact regarding whether methane and VOC contamination may cause an imminent and substantial danger to the environment due to OLI's landfill activities.

15

First, OLI has presented evidence that mass grading could arguably be a source of methane. OLI's expert, Steve R. Nesbitt, opined that:

> It is my opinion that the methane and volatile organic compounds (VOC's) detected in soil gas at the Village III residential and commercial lots did not come from the Landfill and were not the result of LFG [landfill gas] migration from the Otay Landfill waste mass. See Report, ¶ 2.1 at 3. Instead, the methane found at Village III after the mass grading of that site concluded in 2017 resulted from this mass grading and placement of engineered fill throughout Village III. The VOC's at Village III were present due to a combination of pre-existing soil conditions, the mass grading operation, prior farming operations at Village III, and releases of hydrocarbons from properties to the west of Village III along Energy Way.

(Dec. Steve R. Nesbitt at ¶ 11 [ECF No. 117-2.]) The mass grading excavated "topsoil, alluvium, undocumented fill previously dumped on the property, and landslide debris" which were recompacted to create engineered fill that generates methane as the organic matter decomposes. (Nesbitt Dec. ¶13; Nesbitt Report, Ex A ¶ 2.2.2). Nesbitt stated that landfill methane is generally produced in low volumes with high volume concentrations, it is typically not under the kind of pressure that would cause it to migrate, and the methane dissipates after the organic content decomposes. (Nesbitt Dec. at ¶ 14; Nesbitt Report at ¶ 2.1.1 5-7). Nesbitt's conclusions are drawn from multiple lines of evidence including (1) the pattern of methane in Village III soil-gas; (2) organic carbon in Village III engineered fill and underlying sub-soils; (3) LFG "finger-printing" via compositional analysis; and (4) isotope analyses. (Nesbitt Report ¶ 2.1 4-5.)

According to Nesbitt, "the spatial and temporal patterns of methane in Village III soil gas are consistent with generation from localized on-site organic carbon sources" and native topsoil along with other deposits within former ravine valleys have either been confirmed to contain and reasonably can be expected to contain significant concentrations of organic carbon. (*Id.*) In addition, Nesbitt's Report indicated that "[t]here is no correlation of chemical compounds in LFG at the Otay


Landfill with compounds detected in Village III soil-gas" therefore "the characteristics of Village III soil-gas do not 'match' that of LFG originating from within the Otay Landfill waste mass." (*Id.* at 5). Isotope analysis further indicates that "both the carbon dioxide and methane detected within Village III soil-gas did not originate from LFG generated at the Otay Landfill waste mass" according to Nesbitt. (*Id.*)

The report of Defendant's landfill gas expert, Patrick S. Sullivan, further contradicts HomeFed's contentions and supports OLI's contention that the LFG was localized at the center of the Village III development and is not migrating toward Plaintiff's property. (Sullivan Dec. at ¶ 19 [ECF No. 117-3.]) Sullivan opined:

> Based on this analysis of the spatial distribution of methane on the HomeFed property and the location of relevant LFG probes, it is my opinion that the methane detected on the HomeFed property could not have originated from LFG as there is no way methane could have migrated from Otay and affected the HomeFed property at the noted locations without also being detected in concentrations above the regulatory thresholds in the Otay Landfill probes.

(*Id*. at ¶ 20).

In contrast, Plaintiff's expert McCue opined that the geologic conditions at the perimeter of the landfill indicate that soil gas travels through preferential pathways from the landfill to the adjacent properties. In support, McCue explained:

> 1) The LEA [San Diego County DEH Local Enforcement Agency] has documented the ongoing discharge of LFG from the Otay Landfill waste mass into the surrounding vadose zone based on the presence of methane concentrations exceeding 5% in the landfill perimeter gas probes, including perimeter gas probes GP-2, GP-27 and GP-4RR adjacent to the Site (Exhibit 25 and 26); 2) Methane is present in Site lots adjacent to and in close proximity to the landfill, and the methane is present in undisturbed native soil that has not been graded, indicating the methane is not the result of grading operations; 3) the maximum methane concentrations detected on the Site have been in Lots 815 and 826 adjacent to the Otay Landfill and across Heritage Road from the landfill, respectively. The methane concentrations in Lots 815 and 826 were 38,000 ug/m3 and 100,000 ug/m3, respectively. The soil gas sample with the 100,000 ppmv methane concentration was collected in 2021, the last time methane testing was conducted on Lot 826; 4) Methane was detected in the area

of Heritage Road across the Street from the LKQ facility at concentrations equal to or less than 36 ppmv. These concentrations are very low in comparison to the methane concentrations detected in lots adjacent to the Otay landfill, indicating the LKQ related fuel hydrocarbon contamination do not appear to be the primary source of methane detected at the Site; and 5) As discussed below, it has been established the Otay Landfill LFG contains not only methane, but review of Exhibit 41 will show the landfill has the highest concentrations of total VOCs including BTEX detected during all of TRC's investigation activities.

(McCue Dec. ¶ 26 [ECF No. 95-3.])

As a result of the findings, McCue opined that:

The presence of methane, VOCs including BTEX, and VOCs specific to the Otay Landfill in the native soils adjacent to the Otay Landfill indicate the contaminated soil gas is not from a natural source such as vegetation buried during Site grading. Based on these lines of evidence, and on my experience, knowledge and skill, I can state with a reasonable degree of scientific certainty that the Otay Landfill is the primary source of methane detected in soil gas at the Site.

(*Id*. at ¶ 27).

Although Plaintiff asserts it is undisputed that OLI is the source of methane found on the perimeter of its property, Defendant OLI has raised a genuine issue of material fact with regard to whether mass grading by Plaintiff caused the methane, resulting in a "battle of the experts" rendering the issue inappropriate for determination on summary judgment. *See Goldman*, 341 F.3d at 1036. Accordingly, Plaintiff's motion for summary judgment on its RCRA claim against OLI is denied.

V.     RCRA LEGAL VIABILITY

OLI contends that the RCRA claim fails because methane and VOC's are not constituents of solid waste, but are byproducts caused by the biological decomposition of accumulated solid waste, and therefore are not sufficient to establish a violation of RCRA § 6972(a)(1)(B). (Oppo. at 24).

In response, HomeFed argues that the source of the methane gas migrating from the landfill is the disposal of solid waste in the landfill and further, that a landfill's violation of RCRA's requirement that explosive gasses not accumulate is an independent ground for a citizen suit under RCRA. (Reply at 9-10 [ECF No. 121.])

Under §6972(a)(1)(B) any person may commence a civil action on his or her own behalf against any person "who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). OLI cites no binding authority for the proposition that methane gas does not constitute "solid or hazardous" waste as defined under RCRA, and instead, the Ninth Circuit has allowed RCRA claims to proceed on a theory that explosive gases found on a landfill may create an endangerment. *Covington v. Jefferson County*, 358 F.3d 626, 646 (9th Cir. 2004)("A landfill that accepts waste products that can produce explosive gases, while not monitoring for such gases, places the public at risk.") Accordingly, the Court finds no merit to Defendant OLI's contention that the RCRA claim fails to state a cause of action.

VI. MOTION FOR ORDER TREATING SPECIFIC FACTS AS ESTABLISHED

If the Court declines to grant summary judgment, Plaintiff seeks an order stating the following facts are established:

> LKQ has contributed or is contributing to the past or present disposal of oil and petroleum products onto land and this disposal of waste may present an imminent and substantial endangerment to health or the environment: and OLI has contributed or is contributing to the past or present dumping or placing of garbage or refuse onto land, which results in the generation and emission of methane; OLI has been and is in violation of 40 C.F.R. § 258.23(a)(2) and 27 C.C.R. § 20921(a0(2) because methane in soil gas has been and is still in excess of the lower explosive limit of 5% by volume in air at the boundary of the Otay Landfall: and OLI's past and ongoing violations of these state and federal regulations caused by the disposal of waste at the Otay Landfall may present and imminent and substantial endangerment to health or the environment.

(Mot. at 30).

Under Federal Rule of Civil Procedure 56(g), "if the court does not grant all the relief requested by the motion, it may enter an order stating any material fact--including an item of damages or other relief--that is not genuinely in dispute and treating the fact

19

as established in the case." For the reasons stated above, the Court finds these facts in dispute and denies Plaintiff's request to order the facts as established.

### VII. CONCLUSION AND ORDER

For the foregoing reasons, Plaintiff HomeFed's Motions for Partial Summary Judgement or for an Order Treating Specified Facts as Established [ECF No. 95] are DENIED.

IT IS SO ORDERED.

Dated: August 24, 2023

*[signature]*
Hon. M. James Lorenz
United States District Judge