**UNITED STATES DISTRICT COURT FOR THE**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| HOMEFED VILLAGE III MASTER, LLC; | Case No. **3:20-cv-0784-L-JLB** |
| Plaintiff, | |
| vs. | **ORDER DENYING DEFENDANT OTAY LANDFILL'S MOTION FOR SUMMARY JUDGMENT AND DENYING MOTION TO EXCLUDE REPORT AND TESTIMONY OF EXPERT WITNESSES GARY MCCUE AND SIN SENH [ECF NO. 124.]** |
| OTAY LANDFILL, INC et al; | |
| Defendants. | |

Pending before the Court is a Motion for Summary Judgment and Motion to Exclude Report and Testimony of Expert Witnesses Gary McCue and Sin Senh filed by Defendant Otay Landfill ("OLI").  [ECF No. 124].  Defendant American Recycling International, Inc. d/b/a LKQ ("LKQ") and Plaintiff HomeFed filed Responses in Opposition.  OLI filed Replies. The matter is submitted on the briefs without oral argument.  *See* Civ. L. R. 7.1(d)(1).  For the reasons stated below, Defendant OLI's Motions are denied.

//

I.  FACTUAL BACKGROUND

Plaintiff HomeFed is the master develop of a 436-acre residential and commercial subdivision in the City of Chula Vista, consisting of 900 single-family homes plus apartments and commercial structures, called Village III. Village III is bordered on the north by Defendant OLI's landfill and on the west by LKQ's auto salvage yard. In 2017, Plaintiff encountered groundwater contaminated with oil and fuel products while excavating a trench for the installation of a storm drain. HomeFed engaged expert hydrogeologist Gary McCue in 2017 after the discovery of the contaminated water and constructed sumps and storm drain trench cutoff walls to assess ongoing contamination and mitigate the flow of contaminated ground water to the Otay River.

According to the Complaint, LKQ's day-to-day business operations result in oil, gasoline, and vehicle fluids spilling and leaking onto the ground of the vehicle processing yard and these contaminants are absorbed by the soil, migrate downwards, contaminate the subsurface soil, finally reaching an aquifer of perched groundwater at a depth of approximately 32 feet below the surface. This perched groundwater is coated by a thick layer of "free product" and is contaminated with gasoline, MTBE, BTEX, and volatile organic compounds (VOCs). According to the Complaint, contaminated water has escaped from the confines set in place by barriers and now has a direct pathway through Plaintiff's property to the Otay River, a habitat for plants and wildlife, and may present an imminent and substantial endangerment to human health and the environment.

Operation of the Landfill entails the past and ongoing disposal of municipal solid waste onto the property. As the waste breaks down due to anaerobic decomposition, it emits landfill gas (LFG), which consists predominately of methane and carbon dioxide. Excessive concentrations of methane in the soil gas beneath structures threatens the health and safety of building occupants, because methane can accumulate in those structures and blow them up. Landfill operators are required by

state and federal law to control the generation and migration of methane to ensure that the concentration of methane in soil gas at the perimeter of the landfill does not exceed the "lower explosive limit" for methane, which is 5% by volume in air, or 50,000 parts per million by volume (ppm).

An LFG recovery system was installed at the Landfill in 1989. The LFG collection system consists primarily of vertical extraction wells. A vacuum is applied to the wells using blowers located at the power plant and a network of LFG header pipes. As waste continues to be disposed of and accumulates at the Landfill over time, OLI has installed additional vertical LFG extraction wells in an attempt to manage the increasing quantities of LFG released at the site.

After the discovery of contaminated water in the storm trench, the County of San Diego Department of Environmental Health ("DEH") required soil gas testing to assess potential risk from vapor phase intrusion. The Complaint avers that past and present disposal of waste at Defendant OLI's landfill creates dangerous levels of methane which travels through geological pathways to neighboring property, including HomeFed's property, and may present an imminent and substantial endangerment to human health.

II.   RELEVANT PROCEDURAL BACKGROUND

On April 24, 2020, Plaintiff HomeFed Village III filed the original complaint in this action seeking declaratory and injunctive relief, or damages, for Defendants violations of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1), and common law theories of public nuisance, private nuisance, and trespass. [ECF No. 1.]

On May 11, 2020, Plaintiff filed a First Amended Complaint. (FAC [ECF No. 4.]) Defendant LKQ filed a motion to dismiss on July 13, 2020, which was deemed moot by a subsequent joint motion on July 27, 2020. Plaintiff was allowed to amend the complaint and filed a Second Amended Complaint ("SAC") on August 6, 2020. [ECF No. 18.]

On March 7, 2022, the Court granted LKQ's motion to file an amended answer. [ECF No. 73.] On March 15, 2022, Defendant LKQ filed an Amended Answer asserting crossclaims against OLI for equitable indemnity and contribution based on the assertion that contamination at the HomeFed site was due to OLI and not LKQ's actions. [ECF No. 76.]

On October 10, 2022, Defendant OLI filed the present Omnibus Motion for Summary Judgment. [ECF No. 124] On November 3, 2022, Defendant LKQ filed a Response in Opposition. [ECF No. 125.] On November 3, 2022, Plaintiff HomeFed filed a Response in Opposition. [ECF No. 126.] On November 10, 2022, Defendant OLI filed Replies. [ECF Nos. 127-128.]

III.   LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

The party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.  *Id.* at 322–23. If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

4

If the moving party meets the initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elect. Indus. Co., Ltd. v Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, the nonmoving party must "go beyond the pleadings" and by "the depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

The court must draw all inferences from the underlying facts in the light most favorable to the nonmoving party.  *See Matsushita*, 475 U.S. at 587.  "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

"[T]he district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001).  The court is not obligated "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (*citing Richards v. Combined Ins. Co. of Am.*, 55 F.3d 247, 251 (7th Cir. 1995)).  DISCUSSION

IV.   DISCUSSION

Defendant OLI seeks summary judgment on all of HomeFed's claims including Count One: violation of the Resource Conservation and Recovery Act ("RCRA"); Count Two: state law claims of public and private nuisance; Count Three: state law trespass. OLI argues among other things that (1) the Landfill Nuisance Easement bars all of the claims; (2) the RCRA claim fails because Plaintiff's sole expert is not qualified to render an opinion and Plaintiff has no triable issue of fact to show that there is current imminent and substantial endangerment to Plaintiff's property; (3) Plaintiff's state law claims for nuisance and trespass fail because the Court can only exercise supplemental jurisdiction over the claims based on the RCRA claim which should be dismissed, and

Plaintiff has not sustained any damages because third-parties paid for the remediation efforts. (Mot. at 1-3 [ECF No. 124-1.])

OLI seeks summary judgment on LKQ's crossclaims arguing that LKQ has no admissible evidence to support its claims because expert Sin Senh's opinions are based on speculation, are not supported by scientifically reliable data, and should be excluded under *Daubert*. (*Id*. at 28).

### A. HomeFed Claims

#### 1. Landfill Nuisance Easement

OLI argues that Plaintiff's claims are barred by a Landfill Nuisance Easement[1] ("Easement") that was granted by the prior owners of Plaintiff's property to the County of San Diego, which owned the landfill at that time. (Mot. at 16).  OLI contends that Plaintiff was aware of the Easement's provisions because HomeFed issued a disclosure statement that alerted prospective homebuyers to the Easement. (*Id*.)

In response, Plaintiff argues that the Easement does not bar their claims because (1) OLI has violated the terms of the Easement by not maintaining the landfill in compliance with state and federal laws as evidenced by the presence of methane concentrations in excess of 50,000 parts per million at the perimeter of the Landfill; (2) the Easement violates California public policy and is void; (3) the release in favor of the County for future torts affects the public interest and is void; and (4) the Easement has no application to a claim under RCRA in light of the methane exceedances. (Oppo. at 14-23 [ECF No. 126-1.])

A court must interpret easements using the same rules of interpretation as apply to contracts. *Hill v. San Jose Family Housing Partners, LLC*, 198 Cal.App. 4th 764, 777 (Cal. App. 6th 2011).  Determining the intent of the parties is the foundation of contract

---

[1] OLI requests that the Court take judicial notice of the Landfill Nuisance Easement. (Req. Jud. Not. at 1, Ex. A [ECF No. 93].) The document in question is an official public record of the San Diego County Recorder's Office, file stamped March 17, 1997. Therefore, the Court GRANTS the request pursuant to Federal Rule of Evidence 201(b)(2) because it is a matter of public record.

interpretation. *Id*. The language of the contract is analyzed to determine the parties' intent, "if the language is clear and explicit." *Id*.

As a primary matter, OLI did not raise the waiver defense in reference to the Easement agreement in any of the previous court filings. Despite this, the Court now concludes a genuine issue of material fact exists regarding the enforceability of the Easement. Plaintiff claims that the plain meaning of the Easement is that the right of the County/OLI to cause or allow nuisance items to be present on the property is subject to OLI maintaining compliance with State and Federal law, but OLI was out of compliance from January 2009 through February 2011, May 214 through January 2015, March and April 2016, and September 2017. (Plaintiff Oppo. at 15-16). Therefore, Plaintiff argues that OLI's failure to meet the condition precedent to OLI's right to contaminate the subsurface soil renders the Easement void. (*Id*. at 17). OLI counters that there is no conditional language in the Easement that governs onsite regulatory noncompliance. (Reply at 7).

The Court looks to the plain language of the agreement to determine whether it is clear and explicit. *See* Cal. Civ. Code § 1638. ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.") The Easement consists of five paragraphs, with the second and third being the subject of this dispute. The second paragraph is inartfully drafted, leading to the present ambiguity. It states: "This Nuisance Easement is for the use and benefit of Grantee [County of San Diego/OLI] and its successors in interest and invited guests in the conduct of solid waste landfilling operations on the Dominant Tenement, for the free and unobstructed passage on, onto, in, through, and across the surface and airspace above the surface of the Servient Tenement" of all chemicals or particles suspended in the air or wind including methane gas ("Nuisance Items") and

for each, every and all effects as may be caused by or result from the operation of a landfill which is now in existence or which may be developed in the future, together with the continuing right to cause or allow in all of such Servient Tenement such Nuisance Items, *it being understood and agreed that Grantee, or its successors in interest,* intends to develop, *maintain* and expand the landfill on the adjacent Dominant Tenement *in such a manner that said landfill*

*and the easement granted herein will be used at all times in compliance with all applicable State and Federal Laws* and the lawful orders of State and Federal agencies regulating environmental factors, toxic and/or hazardous waste, and the operation of the landfill.

(Req. Jud. Not. Ex A 1-2 [ECF No. 93-1])(emphasis added). The third paragraph consists of the waiver:

> Grantor, for itself and its successors and assigns, does hereby fully waive and release any right or cause of action which they or any of them may now have or may have in the future against Grantee, its successors and assigns, on account of or arising out of such Nuisance Items heretofore and hereafter caused by the operation of the landfill.

(*Id*. at 2).

Looking at the language of the agreement as a whole, the paragraph detailing "Nuisance Items" precedes the waiver paragraph and therefore arguably serves as a prefatory clause to the waiver. *Waller v. Truck Insurance Exchange*, 11 Cal.4th 1, 18 (1995)("[L]anguage in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract.) Moreover, the language within the "Nuisance Items" paragraph states that the parties "understood and agreed" that OLI as the successor in interest would "maintain" the landfill "in such a manner that said landfill and the easement granted herein will be used at all times in compliance with all applicable State and Federal Laws." (Req. Jud. Not. Ex A 1-2 [ECF No. 93-1]). Plaintiff's contention that this language created a condition precedent to the waiver should be interpreted "most strongly against the party who caused the uncertainty to exist" which is OLI's predecessor to the agreement." *ASP Properties Group, v. Fard, Inc.,* 133 Cal.App.4th 1257, 1269 (Cal. App. 4th 2005). For these reasons, the Court finds that there is a genuine issue regarding the enforceability of the Easement and therefore, summary judgment on these grounds is denied.[2]

//

//

---

[2] In light of the Court's finding regarding the waiver provision, the Court refrains from addressing Plaintiff's remaining challenges to the Easement's enforceability.

## 2. *RCRA Claim*

OLI argues that HomeFed cannot maintain its RCRA claim because (1) it does not have an expert qualified under Rule 702 to render an opinion on imminent and substantial endangerment, (2) Plaintiff relies solely on methane and VOC exceedances on the landfill rather than methane or VOC exposure on Plaintiff's land, (3) HomeFed previously admitted through McCue that there is no imminent and substantial endangerment for Lots 814-816 which encompasses large portions of Plaintiff's property, (4) HomeFed cannot identify any specific action OLI can be ordered to take that would redress alleged harm, (5) HomeFed is seeking the same relief that the LEA is already regulating (6) HomeFed admits its own vapor-barrier remedy resolved any alleged imminent and substantial endangerment. (Mot. at 18-23).

The Court first addresses OLI's challenges to the expert opinions of Gary McCue which are offered in support of Plaintiff's RCRA claim.

### A.  McCue's Expert Opinions

In *Daubert* the Supreme Court held that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to "ensure that any and all scientific testimony ... is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (citing *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 597 (1993)). FRE 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed.R.Ev. 702. When determining whether an expert's methodology is reliable, a court should consider factors such as "testing, peer review, error rates, and 'acceptability' in the relevant scientific community." *Kumho Tire Co.,* 526 U.S. at 141 (citing *Daubert*, 509 U.S at 593–94). "The test is whether or not the reasoning is scientific and will assist the jury. If it satisfies these two requirements, then it is a matter for the finder of fact to decide what weight to accord the expert's testimony." *Kennedy v. Collagen Corp*., 161 F.3d

9

1226, 1230 (9th Cir.1998). "As one court has summarized: 'Disputes as to the strength of [an expert's] credentials, faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony.'" *Id*. (citing *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir.1995).)

The Court finds that McCue's conclusions are based on scientific reasoning and will assist a jury. McCue based his determination that OLI was the source of LFG on Plaintiff's property in part on the findings of "SCS Engineers [who] identified a cause of the landfill gas migration from the waste mass to the perimeter of the landfill property. Based on the evaluation of soil drill cores, a fractured sandstone layer was identified. SCS Engineers state the fractured sandstone may indicate the presence of a series of preferential migration pathways for LFG coming from the unlined portion of the refuse mass." (*Id*. at ¶ 24). McCue concluded that

> [t]he presence of methane, VOCs including BTEX, and VOCs specific to the Otay Landfill in the native soils adjacent to the Otay Landfill indicate the contaminated soil gas is not from a natural source such as vegetation buried during Site grading. Based on these lines of evidence, and on my experience, knowledge and skill, I can state with a reasonable degree of scientific certainty that the Otay Landfill is the primary source of methane detected in soil gas at the Site.

(*Id*. at ¶ 27).

In connection with this case, McCue testified that he read some guidance documents and regulations regarding landfill gas which added to his professional and educational experience in the fate and transports of organic chemicals. (Bruen Dec. McCue Dec. Ex F at 27:8-28:18). However, this is not the sum of the resources and experience McCue relied upon in reaching his conclusion. McCue's prior experience includes work on the McColl Superfund site that generated methane where he "was doing air monitoring. . . making sure that they were not causing releases of gas to the atmosphere that would impact the surrounding community." (*Id*. at 16:1-17:11).

10

OLI argues that McCue lacks a reliable methodology because he does not explain in his Expert Report how any Landfill regulatory exceedances has resulted in LFG migrating from the Landfill on to Plaintiff's property, claiming that McCue knows nothing about landfill construction including the Otay Landfill's "impermeable geosynthetic liner." (Reply at 6). Although McCue has not designed gas collection systems or perimeter probe networks for a municipal waste landfill, during his career he designed "a field of soil vapor extraction wells and dual-phase extraction wells and groundwater extraction wells to remediate contamination in soil and groundwater." (*Id.* at 25:1-26:1-15). OLI does not explain how this experience is not relevant.

As demonstrated above, McCue's opinions are based on "objective, verifiable evidence," including the discovery by SCS engineers of a fractured sandstone layer that creates a preferential pathway for the migration of methane from OLI's property, therefore, Plaintiff has established by a preponderance of evidence that a proper foundation exists for admissibility of McCue's expert testimony. *See Daubert*, 43 F.3d at 1318.

In light of the Court's findings regarding the admissibility of McCue's opinions, the Court turns to the merits of OLI's motion.

**B.    RCRA Claim**

The Citizen Suit provision of RCRA, 42 U.S.C. § 6972(a)(1)(B), allows any person to commence a civil action on his own behalf against any person, "including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which *may* present an *imminent and substantial endangerment* to health or the environment." (Emphasis added).

To establish liability under RCRA, a court must find: "(1) that the defendant 'ha[s] contributed to the past or [is] contributing to the present handling, treatment, transportation, or disposal' of certain material; (2) that this material constitutes "solid

waste" under RCRA; and (3) that the solid waste 'may present an imminent and substantial endangerment to health or the environment.'" *California River Watch v. City of Vacaville*, 39 F.4th 624, 629 (9th Cir. 2022). The Ninth Circuit has held that "contribution" requires "that a defendant be actively involved in or have some degree of control over the waste disposal process to be liable under RCRA." *Hinds Investments, L.P. v. Angioli*, 654 F.3d 846, 851 (9th Cir. 2011). Thus, district courts have found that "causation is a part of the contribution element." *City of Imperial Beach v. International Boundary & Water Commission*, 337 F.Supp. 3d 916, 931 (S.D. Cal. 2018).

Pursuant to 42 U.S.C. § 6903(3), the term "disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." Pursuant to 42 U.S.C. § 6903(27), "solid waste" means any "discarded material, including solid, liquid [or] semisolid … material resulting from resulting from industrial, commercial, mining, and agricultural operations, and from community activities[..]

The party seeking redress does not need to show "that actual harm will occur immediately so long as the risk of threatened harm is present: 'An 'imminent hazard' may be declared at any point in a chain of events which may ultimately result in harm to the public.'" *Price v. U.S. Navy*, 39 F.3d 1011, 1019 (9th Cir. 1994). The endangerment provision broadly permits relief "that ameliorates present or obviates the risk of future 'imminent' harms." *Ecological Rights Foundation v. Pacific Gas & Electric Company*, 874 F.3d 1083, 1089 (9th Cir. 2017)(citing *Meghrig v. KFC Western, Inc.,* 516 U.S. 479, 486 (1996)). District courts have found that a substantial endangerment does not require quantification but that an endangerment is considered substantial "if there is some reasonable cause for concern that someone or something may be exposed to a risk of harm by a release or a threatened release of a hazardous

substance if remedial action is not taken." *California Dept. of Toxic Substance Control v. Interstate Non-Ferrous Corp*., 298 F.Supp. 2d 930, 980 (E.D. Cal. 2003); *Buggsi, Inc., v. Chevron U.S.A., Inc*., 857 F.Supp. 1427 (D. Ore. 1994).

Because courts have held that the operative word in § 6972(a)(1)(B) is "may," it follows that "a finding that an activity may present an imminent and substantial harm does not require actual harm."  See *Price v. U.S. Navy*, 39 F.3d 1011, 1019 (9th Cir. 1994). Accordingly, Plaintiff does not need to show an "injury in fact" to maintain its RCRA claim despite OLI's assertion that HomeFed is required to have an imminent or substantial endangerment on its own property and cannot simply rely on landfill methane and VOC exceedances to pursue its RCRA claim.

OLI claims that HomeFed previously admitted that there is no unacceptable risk to California regulators and homeowners, but this mischaracterizes Plaintiff's admissions. In the Revised Assessment Report submitted to the California Environmental Protection Agency, TRC assessed the danger of soil gas to commercial and industrial workers. (Bruen Dec. Ex. D ("Revised Assessment Report" at 156-157 [ECF No. 124-3.]) The report summarized the findings of soil gas and concluded that "exposure to COPC's in soil gas emanating into indoor air is unlikely to pose unacceptable risk to commercial/industrial workers at the Subject Lots" based on full-time employees working in the area of the maximum detected soil gas without mitigation measures in place. (*Id*. at 157).  The report recommended that although the "current individual concentrations of VOC's and methane do not warrant a response action" and "inhalation of soil gas vapors in indoor air is unlikely to pose unacceptable risk to future commercial/industrial workers at the Site", implementation of mitigation measures was advised on a precautionary basis. (*Id*. at 159). Rather than indicating there is no imminent and substantial endangerment, the report conclusions and recommendations indicate that mitigation measures were advised because there *may* be a threat in the future. Additionally, the report findings cited by OLI concern only commercial/industrial workers and not residents on the property. For purposes of

summary judgment, the Court construes the facts in the light most favorable to HomeFed and concludes that there is a genuine issue of material fact with regard to the future danger posed by soil gas on the property. *Matsushita*, 475 U.S. at 587

Similarly, the requirement that the City of Chula Vista mandated the installation of vapor barriers before it would issue any building permits on Village III does not bar Plaintiff's RCRA claim from moving forward. Plaintiff acknowledges that "[i]f *all* of the planned development of the land surrounding the Landfill was *completed* and *all* of the structures on this land had been retrofitted with mitigation measures, OLI would have a colorable argument that injunctive relief under RCRA is unnecessary- the property owners could simply sue OLI for damages for the cost of these mitigation measures." (Oppo. at 30-31)(emphasis in original). However, it is unclear whether HomeFed has completed the buildout of Village III and other parcels where development plans were in place, including Village II which is adjacent to the Landfill on its eastern and northern perimeters. If the development has been completed, it appears that the City of Chula Vista required installation of mitigation measures prior to granting building permits, therefore injunctive relief would be unnecessary. (Dec. Penner ¶ 23 [95-5.])  Because it is uncertain whether HomeFed has completed the development of the property, a genuine issue of material facts exists as to whether injunctive relief under RCRA would prevent further harm.

OLI argues that HomeFed cannot identify any specific action OLI can be ordered to take that would redress alleged harm, and instead has generally stated "What we are asking for is the – for the contamination that we believe is coming from your client's property, we want it to stop coming across." (Mot. at 21). OLI contends that HomeFed provides brand new opinions in its opposition that were not disclosed in their reports under Rule 26(b)(3) despite the Rules and the Scheduling Order requiring them to do so, therefore the additional evidence should be disregarded. (Reply at 4).

The Court finds that HomeFed has identified specific remedial measures that could be included in an injunction. *See* Fed. R. Civ. P. 65(d)(1)(An injunction must

"state the reasons why it is issued, (B) state its terms specifically and (C) describe in reasonable detail--and not by referring to the complaint or other document--the act or acts restrained or required.")  McCue suggested that

> Given the history of exceedances detected in Otay Landfill perimeter probes and the need to protect human health, the Otay Landfill should implement measures to intercept landfill gas prior to it reaching the Site. Strategically adding SVE wells with overlapping radius of influence between the waste pile and the landfill perimeter probes along the entire boundary between the landfill and the Site could be implemented to prevent migration of landfill gas off the landfill property.

(McCue Dec. ¶ 21[ECF No. 126-3.])

In addition, HomeFed expert Stephen V. Huvane recommended that

> Given the volume of LFG generated at the landfill, preventing concentrations of methane in excess of the LEL from migrating off of the landfill would require the installation and operation of additional soil vapor extraction wells in the lateral areas between the perimeter probes, possibly very closely spaced to provide a continuous zone of influence along the entire boundary shared with Village III. Similarly, LFG migration could be prevented with certainty by constructing a deep barrier wall, such as a soil-bentonite slurry wall or soil-mix wall.

Huvane Dec. ¶ 31 [ECF No. 126-4.])

Although OLI argues that Plaintiff violated Rule 26(b)(3) and the Court's scheduling order by submitting these proposed mitigation measures after the deadlines, the Court finds no violation. The Scheduling Order simply stated that "all parties must complete all fact discovery by July 30, 2021. "Complete" means that all discovery under Rules 30 through 36 of the Federal Rules of Civil Procedure, and discovery subpoenas under Rule 45" must be completed by the cut-off date. (Scheduling Order at ¶ 3 [ECF No. 26.])  OLI cites *Allegro Ventures, Inc. v. Almquist*, No. 11-cv-2009-L (WVG), 2014WL 1871628 at *7 (S.D. Cal. May 8, 2014) to support their request for sanctions against HomeFed for late disclosure of the proposed remedial measures, however *Allegro* is inapposite and not binding.  In *Allegro*, plaintiff disclosed four new fact witnesses it intended to call at trial a month after the Rule 26 deadline despite the parties having been warned that any failure to comply with the deadline would result in the imposition of sanctions. *Id*. The Court excluded the witnesses finding that it would be

unfair and would impose a great hardship if Allegro was allowed to present the witnesses, due in large part to the fact that Allegro provided no explanation as to why it did not identify the witnesses earlier. *Id*. In contrast, the proposal of remedial measures to support a request for injunctive relief does not work the same kind of hardship on the Defendants as the late disclosure of fact witnesses set to testify at trial after parties were explicitly warned to comply with the discovery deadlines. Accordingly, the Court declines to exclude the proposed measures and declines to issue sanctions for Plaintiff's inclusion of specific remedial measures to support its request for injunctive relief.

OLI further argues that the San Diego's Local Enforcement Agency ("LEA") is already actively addressing the Landfill's probe exceedances that violate 27 C.C.R. § 20921 therefore the Court should refrain from ordering duplicative or conflicting relief, but there is no evidence that LEA has issued any order or taken any action to compel OLI to investigate whether methane and VOC's are migrating beyond the perimeter of the Landfill on to adjacent properties.

The LEA enforces a comprehensive regulatory scheme on the Landfill. OLI's gas monitoring and control program must "ensure detection of the presence of LFG migrating beyond the disposal site permitted facility boundary and also into on-site structures." 27 C.C.R. § 20923(a)(1). If any of the Landfill's monitoring results indicate non-compliance with Section 20921 (including any exceedance of 5% methane by volume in air), OLI must fulfill regulatory requirements as outlined in Section 20937. *Id.* ¶ 20. First, OLI must "[i]mmediately take all steps necessary to protect public health and safety and the environment," which includes notifying the LEA by phone or email. 27 C.C.R. § 20937(a)(1)). Within 7 days, OLI must verify the results, and then submit a letter to the LEA describing the levels of methane detected, a description of the nature and extent of the problem, the steps to rectify the problem, and a description of further corrective actions. 27 C.C.R. § 20937(a)(2)(B). Thereafter, and within 60 days of detection, OLI must "implement a remediation plan," which must be approved by the

1  LEA for the methane gas releases. That plan must "describe the nature and extent of the

2  problem and the proposed remedy." 27 C.C.R. § 20937(a)(3).

3        Despite the monitoring and control program in place with LEA, there is no

4  evidence before the Court that LEA's oversight actions and regulation have actively

5  addressed the subsurface migration of LFG off the landfill. At a minimum, there is a

6  genuine issue of material fact regarding whether the specific relief Plaintiff seeks is

7  already being provided by California regulators. *Anderson*, 477 U.S. at 248. For the

8  foregoing reasons, the Court denies summary judgment on Plaintiff's RCRA claim.

9            *3.  State Law Nuisance and Trespass*

10        OLI argues that it is entitled to summary judgment on HomeFed's nuisance and

11  trespass claims because Plaintiff has not paid for any of the remediation costs but

12  instead those costs were paid by separate, third-party entities. (Mot. at 24-25).

13  According to OLI, Plaintiff cannot recover for remediation work performed by Damato

14  Associates, Inc. ("DAI"), ReyLenn's, or TRC, because those costs were incurred when

15  Plaintiff did not own the subject property. (*Id*. at 26). Plaintiff cannot recover for TRC's

16  litigation support work and investigation related to Allied, who is no longer part

17  of the litigation. (*Id*. at 27).

18        In response, HomeFed claims that all the "third-party entities" identified by OLI

19  are wholly-owned consolidated subsidiaries of HomeFed LLC who have provided an

20  assignment of rights to the named plaintiff HomeFed to allow it to pursue recovery of

21  these costs as damages. (Oppo. at 33-34).  In addition, Plaintiff argues that HomeFed

22  or other subsidiaries of HomeFed LLC owned or controlled all the subject property

23  when the assessments and investigation work was done. (*Id*. at 34).

24        There is a genuine issue of material fact regarding the corporate relationship

25  between Plaintiff HomeFed Village III Master LLC; HomeFed LLC; HomeFed Otay

26  Land II, LLC; HomeFed Otay Construction, Inc.; Village of Escaya Apartments, LLC;

27  and Village of Escaya Mixed Use, LLC. Plaintiff submitted a declaration from Erin

28

Ruhe, HomeFed LLC's Chief Financial Officer which described the relationship between Plaintiff and its parent HomeFed:

> The costs claimed by Plaintiff are costs that were incurred exclusively by HomeFed, through one or more of its wholly owned subsidiaries, in response to the discovery of soil, soil gas, and groundwater contamination on Village 3. HomeFed seeks recovery of these costs through Plaintiff, which is the HomeFed subsidiary holding title to land within Village 3 when these costs were incurred.

(Dec. Ruhe ¶ 12 [ECF No. 126-7.]) Ruhe explained the financial relationship between the subsidiaries and parent HomeFed LL as follows:

> As stated above, although HomeFed's subsidiaries may maintain bank accounts in their separate names, HomeFed and its subsidiaries are consolidated, and intercompany transactions are eliminated. To the extent costs claimed as damages by Plaintiff in this lawsuit were paid by HomeFed through accounts in which the named accountholder was a HomeFed subsidiary other than Plaintiff, each of those subsidiaries has provided an assignment of rights to Plaintiff to allow Plaintiff to pursue recovery of those damages on behalf of HomeFed.

(Dec. Ruhe ¶ 13 [ECF No. 126-7.])

Attached to Ruhe's declaration are three documents titled Assignment of Rights which state they were executed and delivered in 2017 and purport to assign the rights to all claims arising out of any costs incurred or paid to mitigate or remediate soil, gas and groundwater contamination of HomeFed Village III, LLC, HomeFed Otay Land II, LLC, HomeFed Otay Construction, Inc., Village of Escaya Apartments LLC, and Village of Escaya Mixed Use, LLC to Plaintiff HomeFed Village III Master, LLC. (*Id.* at Ex. A). OLI claims that the documents directly contradict the testimony of HomeFed's 30(b)(6) witness in which he stated that he did not "think there are any intercompany agreements amongst the different entities…" and that the documents are shams because Plaintiff admits they were created recently. (Reply at 8-10).

Counsel for Plaintiff acknowledged that the documents were "not previously disclosed because these documents did not exist" explaining that "[t]hese documents memorialize intercompany transfers of rights between several consolidated subsidiaries of HomeFed, LLC, which transfers predated the filing of the lawsuit and were not

previously reduced to writing. (See, Civ. Code 1052.)" (Reply Bruen Dec., Ex. H [ECF No. 128-3.]) California Civil Code section 1052 states that "a transfer may be made without writing, in every case in which a writing is not expressly required by statute." Cal.Civ.Code § 1052. Whether the transfers at issue in this case required a writing memorializing their terms cannot be determined at this stage in the proceedings. *Anderson*, 477 U.S. at 255. Instead, the declaration statements by Ruhe and the attached Assignment of Rights documents raise an issue whether the documents conflict with the 30(b)(6) testimony or are instead clarifying evidence. *See generally Snapp v. United Transportation Union*, 889 F.3d 1088, 1103 (9th Cir. 2018)(A party is generally not allowed to defeat a motion for summary judgment based on an affidavit that conflicts with a Rule 30 witness statement but the rule only applies "where the purportedly conflicting evidence truly, and without good reason or explanation, is in conflict, i.e., where it cannot be deemed as clarifying or simply providing full context for the Rule 30(b)(6) deposition.")

OLI further argues that costs incurred by parent HomeFed LLC cannot be claimed by Plaintiff HomeFed Village III Master, which is allegedly a subsidiary and did not directly incur damages. (Reply at 11-12). It is unclear from Plaintiff's responsive briefing whether they are claiming that Plaintiff HomeFed Village or parent HomeFed LLC is seeking to recover damages it incurred. Viewing the evidence in the light most favorable to Plaintiff, the Court finds that there is a genuine issue of material fact regarding the legal relationship between HomeFed LLC, and its purported subsidiaries including Plaintiff HomeFed Village III Master, and the extent to which Plaintiff may seek damages for trespass and nuisance in light of these questions of fact. *Anderson*, 477 U.S. at 248.

### B.  LKQ Crossclaims

Defendant LKQ has filed crossclaims against Defendant OLI for equitable indemnity and contribution, contending that if the HomeFed storm drain trench was contaminated with VOC's, these VOC's were not from Defendant LKQ's property but

were transported in groundwater that was contaminated with these VOC's at Defendant OLI's Otay Landfill and that was transported in a perched aquifer from the landfill property to the HomeFed trench. OLI denies these allegations.

OLI moves for summary judgment on LKQ's crossclaims arguing that LKQ has no admissible expert evidence to support its claims because their sole expert, Sin Senh, has provided no data or methodology to support his opinion that OLI is the likely source of contamination found at HomeFed's Stormwater Trench, therefore his report and testimony must be excluded under *Daubert*. (Mot. at 28).

   1. *Daubert*

OLI argues that Sin Senh's expert report and testimony must be excluded under *Daubert* because they are based on speculation and not on reliable scientific evidence. (Mot. at 28). OLI further contends that Senh's conclusions must be excluded because he did not include groundwater sampling data to verify the existence of groundwater contamination and did not support his opinions with reliable methodology. In contrast, OLI claims it has over two decades of groundwater data that do not show that any gasoline or BTEX has ever left the Landfill property in groundwater. ((Reply at 2, Mot. at 30). LKQ cannot alternatively rely on the evidence submitted in support of its opposition to the motion because they are documents consisting of third-party hearsay and LKQ fails to provide expert testimony to explain according to OLI. (Reply at 5-6).

LKQ argues that Senh has sufficiently supported his report and testimony by relying on evidence of groundwater elevation and flow data provided by a regulatory agency, disposal records and reports, and environmental reports. (LKQ Oppo. at 11). The disposal records, environmental reports, and regulatory reports were subjected to normal scientific scrutiny and Senh explained how his conclusions were reached with reference to these objective sources. (*Id*. at 12-13).

In his declaration, Sin Senh explains the methodology he used to reach his conclusion that OLI and not LKQ was the source of fuel contaminated groundwater. According to Senh, he relied on data from IT Corp., SCS Engineers, and Geo-Logic to

determine that the landfill has seen a dramatic increase in the quantities of "special wastes" that consists of "predominantly hydrocarbon contaminated soils" from 1992 to 2019, and that the State Water Resource Control Board identified that "MTBE, TBA, other fuel oxygenates, other petroleum, other solvent or non-petroleum hydrocarbons and total petroleum hydrocarbons, and total petroleum hydrocarbons (TPH)" were potential contaminants of concern at the landfill. (Senh Dec. at 3 [ECF No. 125-2.]) From this data, Senh concluded that OLI was a potential source of petroleum contamination and proceeded to use his "hydrogeological training to determine whether perched groundwater from Otay Landfill could migrate from the landfill to the HomeFed Trench." (*Id*.)

Senh noted that there is significant elevation data to conclude that groundwater flow migrates south-southwest toward the HomeFed site, which is consistent with "the volumes of reports collected by SCS Engineering and Geo-Logic Associates on behalf of OLI." (*Id*.) Based on the evidence that OLI accepted "petroleum wastes and is hydraulically upgradient from the Heritage Road Sumps" Senh concluded that "OLI is the most likely source of contamination found at the HomeFed trench." (Id. at 6). Senh stated that he relied on reports including the "Phase I Environmental Site Assessment prepared by Geocon in 2015 for HomeFed prior to the discovery of contamination at the HomeFed site, which identified OLI as a REC for the property." (*Id*.) Accordingly, Senh's conclusions rest on reliable scientific data. *Kennedy*, 161 F.3d at 1230.

As to OLI's argument that Senh should have collected fingerprinting evidence to compare the contamination at the OLI site and the HomeFed site, Senh explained that his expert opinion did not rely on fingerprinting because he is not a forensic chemist but is a hydrogeologist, and even if he was, there was insufficient time between when LKQ amended its complaint and the time the expert report was required to conduct these studies. (*Id*. at 8). With regard to OLI's claim that they have over 25 years of groundwater monitoring data that shows no contamination leaving the landfill, Senh notes that the lower perched aquifer monitoring network is inadequate as indicated by

Geo-Logic's October 2021 Semiannual Water Quality Monitoring Report which indicated insufficient data in the lower perched aquifer. (*Id*. at 5). As a result, OLI's monitoring data is incorrect, according to Senh.

Accordingly, LKQ has shown by a preponderance of the evidence that Sin Senh's expert report and testimony relies on sufficient reliable methodology to be admissible under *Daubert* and therefore, LKQ has expert opinion to support its crossclaims   *See Daubert,* 43 F.3d at 1318. To the extent the evidence submitted with the Declaration of Willis Hon was relied upon by Senh in forming his conclusions, it is not inadmissible hearsay because it is not being offered to prove the truth of the matter asserted but instead to illustrate the methodology of expert Senh. LKQ, through Senh's expert testimony, has raised a genuine issue of material fact with regard to whether OLI and not LKQ was the source of petroleum-based contamination in the HomeFed Stormwater Trench, and therefore, the Court denies OLI's motion for summary judgment on LKQ's crossclaims.

## V.   CONCLUSION AND ORDER

For the foregoing reasons, Defendant OLI's Motion to Exclude Report and Testimony of Experts McCue and Senh is DENIED and OLI's Motion for Summary Judgement is DENIED as to HomeFed and Defendant LKQ [ECF No. 124.]

IT IS SO ORDERED.

Dated:  September 6, 2023

Hon. M. James Lorenz
United States District Judge